William E. DAVIS *v.* STATE of Arkansas

CR 01-433 86 S.W.3d 872

Supreme Court of Arkansas
Opinion delivered September 12, 2002

Substituted Opinion on denial of rehearing delivered
October 24, 2002

*Robert L. Depper, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. William E. Davis appeals his conviction for capital murder and sentence of life without parole. The conviction is based on accomplice liability. This case comes before this court pursuant to Ark. Sup. Ct. R. 1-2(a)(2) as a criminal case in which the penalty of life imprisonment without parole has been imposed.

Davis asserts seven issues on appeal. He asserts that the trial court erred in denying his motion for a directed verdict, that the trial court abused its discretion when it denied his motion to transfer to juvenile court, that the trial court abused its discretion in the admission of photographs of the victim, that the trial court erred in declaring Matthew Elliott a hostile witness, that the trial court erred in denying admission of a letter to impeach witness Elliott, that the trial court erred in finding it lacked jurisdiction to hear certain posttrial motions, and that the trial court erred in denying bail. We hold there was no error and no abuse of discretion. The trial court is affirmed on all points.

*Facts*

Sometime in the early hours of February 5, 2000, Matthew Elliott bludgeoned fifteen-year-old Brittni Pater at least seventeen

times in the head with a two-foot aluminum bar. He then drove over her head with his car. Brittni died from her injuries. Elliott killed Brittni because he believed she was pregnant with his child. Davis was convicted of being an accomplice.

The facts implicating Davis as an accomplice in the murder were provided almost exclusively through the testimony of accomplice Elliott. Elliott's testimony is summarized as follows. Sometime before Christmas in December 1999, Brittni Pater told Elliott over the phone that she was pregnant with his child. Brittni was fifteen and Elliot was sixteen at that time. According to Elliott, Brittni wanted an abortion and asked that he arrange and pay for it. Elliott then testified that, about the middle of January 2000, he called Davis, who had been his friend since first grade, and asked him to come by his house. Elliott testified that they spoke in Davis's car, and that they discussed solutions to Elliott's problem, such as leaving home, going to his parents, or murdering Brittni. Elliott further testified that he concluded during the conversation that he was going to murder Brittni, and that he believed he communicated that conclusion to Davis. According to Elliott, they commenced planning Brittni's murder at that point.

Elliott testified that he believed that he had enlisted Davis's help in carrying out the murder, and that they discussed it a number of times informally in the halls at school in the following days. According to Elliott's testimony, he and Davis then met formally a second time in their cars at school to make final plans for the murder. Elliott testified that they set up a camping trip to Davis's father's hunting lease as an alibi and set the weekend when the murder was to be committed.

Elliott further testified that they planned to go to Brittni's house and kill her there, that Elliott would strike the blow, and that Davis would be present to help with the body. In this same regard, Elliott testified that he talked Davis into allowing him to bury the body on Davis's father's hunting lease, and that Davis went there and selected a secluded grave site. According to Elliott, Davis took him to the site Davis had selected where the two of them dug the grave. Elliott also testified that Davis got down in

the grave and laid down to make sure it was long enough because they knew Davis was taller than Brittni. Elliott further testified that he provided the shovels they used to dig the grave, but Davis hauled them out to his house where they left Davis's car. After leaving his car there, Davis got on a four-wheeler, and Elliott followed him to the deer camp in his own car. Elliott then testified that he left his car where he could get to it from the deer camp so that no one would know he had left the deer camp and gone to town to get Brittni and kill her. He also testified that Davis had a key to his car in case something unexpected occurred and Davis needed to move the car.

Elliott then testified that he spoke to Davis about a weapon, and that Davis gave him the aluminum bar that he used to kill Brittni. Elliott also testified that he and Davis discussed evidence such as blood and hair. They decided to put plastic in the car so that Brittni's body would not leave blood and hair in the car. According to Elliott, Davis got the plastic from Kroger where Davis worked.

According to Elliott's further testimony, he and Brittni agreed that she would sneak out of her house that night at 2:00 a.m. under the pretense of taking her to get an abortion, but the evening of the murder did not go as he planned. Davis's brother-in-law ended up going to the deer camp with them that night after Elliott and Davis returned to town to eat and get the plastic. Elliott testified that he asked Davis to make an excuse to cause his brother-in-law to leave the camp so that they could go murder Brittni pursuant to the plan. According to Elliott, however, Davis would not do so. Davis told Elliott that he was drunk and was not going anywhere. Elliott testified that at that point he decided to go alone. Elliott stated that he was going to ride the four wheeler. Davis's brother-in-law expressed concern about Elliott's sobriety, but later let him go, telling Elliott that if he did not return, they would come looking for him. Elliott testified that Davis gave him a watch and told him to be back by 3:00 a.m. Elliott left on Davis's four-wheeler to go to his car.

Elliott then testified that he picked up his car and drove to the Pater home. Brittni came out to Elliott's car as planned. Elli-

ott decided he could not kill her there because they were too close to the house. So he drove Brittni out of town. Outside of town, Elliott stopped the car, telling Brittni that he was covering his license plate in case his parents called him in as a runaway. It was there that Elliott struck her with the aluminum bar and killed her. He testified that he struck her more than ten times. He also testified that he feared she was still alive so he drove over her head with the tires of his car.

Dr. Charles Paul Kokes, an associate medical examiner for the State of Arkansas, expressed the opinion that Brittni died as a result of seventeen blows to her head. Davis's father testified that he had a bar of aluminum on which he had fashioned a handle that appeared to be State's Exhibit 3, the murder weapon. He further testified that he had checked his home after the murder and found that the aluminum bar was missing. Christopher Burns testified that on about January 31, or February 1, 2000, Elliott told him he planned on killing Brittni with "either a knife or a metal object that he said he got from William or is going to get from William. He never stated he did get it from William."

Davis admitted in a statement to police that Elliott told him of his intent to kill Brittni, and that Elliott took him out to dig the grave. Davis also told police that he tried to convince Elliott not to kill her, but he admitted that he did help dig the grave. John Bishop of the Arkansas State Police testified that he found two sets of footprints at the grave site, one on the soil dug from the grave and one in the bottom of the grave. Davis's mother testified that at about 5:30 on Friday evening before the murder, Elliott and Davis arrived at the Davis home. Their shoes were muddy and they left them outside. She further testified that although she saw Elliott's shoes on her back porch that night at 10:30 p.m. when she checked her locks, the shoes were gone the next morning.

Bishop testified that Exhibit 25 was plastic that had blood and hair on it. He further testified that the aluminum bar was found on Exhibit 25. Foster Bailey, manager of the Kroger store, testified that Exhibit 25 was plastic of the type used in the store, and that while such plastic is occasionally given to the public, it is generally only accessible to employees. Bishop also testified that

Exhibit 34 was a roll of plastic that he obtained from the floorboard of Elliott's blue Toyota, and that he obtained a similar roll from Kroger. Bailey testified that Exhibit 34 was a roll of trash liners or bone liners that were used in the store and which were available to employees in the break room.

### Directed Verdict

Preservation of Davis's right against double jeopardy requires that we consider the challenge to the sufficiency of the evidence before we consider alleged trial error even though the issue was not presented as the first issue on appeal. *Price v. State*, 347 Ark. 708, 66 S.W.3d 653 (2002); *King v. State*, 323 Ark. 671, 916 S.W.2d 732 (1996).

It is well settled that a motion for a directed verdict is a challenge to the sufficiency of the evidence. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002). *See also, Smith v. State*, 346 Ark. 48, 55 S.W.3d 251 (2001). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Smith, supra.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Atkinson, supra.* When a defendant challenges the sufficiency of the evidence convicting him, the evidence is viewed in the light most favorable to the State. *Id.* Only evidence supporting the verdict will be considered. *Id.*

Davis moved for a directed verdict, alleging that there was insufficient evidence to support accomplice liability. In reply to the State's argument at trial, Davis's counsel stated, "Of course, Your Honor, what I am suggesting is that there has not been any corroborating evidence of the defendant's testimony." The reference to the "defendant's testimony," is apparently a reference to the testimony of Elliott.

Davis's criminal liability is based upon his status as an accomplice. A person.is criminally liable for the conduct of another person when he is the accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402 (Repl. 1997).

Under Ark. Code Ann. § 5-2-403 (Repl. 1997), an accomplice is defined as follows:

> (a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:
> (1) Solicits, advises, encourages, or coerces the other person to commit it; or
> (2) Aids, agrees to aid, or attempts to aid the other person in planning or committing it; or
> (3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.
> (b) When causing a particular result is an element of an offense, a person is an accomplice in the commission of that offense if, acting with respect to that result with the kind of culpability sufficient for the commission of the offense he:
> (1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the result; or
> (2) Aids, agrees to aid, or attempts to aid the other person in planning or engaging in the conduct causing the result; or
> (3) Having a legal duty to prevent the conduct causing the result, fails to make proper effort to do so.

The determination of the status as an accomplice is ordinarily a mixed question of law and fact. *Atkinson, supra.* In this case, the issue was submitted to the jury. The facts do not place Davis at the murder scene. However, that is not necessary. A criminal defendant is an accomplice where the defendant renders the requisite aid or encouragement to the principal with regard to the offense at issue, irrespective of the fact that the defendant was not present at the murder scene and did not directly commit the murder. *Atkinson, supra.* *See also, Sumlin v. State,* 273 Ark. 185, 617 S.W.2d 372 (1981). Although Davis was not present at the murder, he may be liable as an accomplice if he assisted and actively participated in the crime. *Crutchfield v. State,* 306 Ark. 97, 812 S.W.2d 459 (1991). When two persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. A participant cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole. *Crutchfield, supra; Parker v. State,* 265 Ark. 315, 578 S.W.2d 206 (1979).

The facts asserted against Davis involve him in planning the murder from the moment Elliott decided to resolve the pregnancy problem by murdering Brittni. There was evidence that he agreed to be present at the murder to assist with disposing of the body, that he helped Elliott in choosing a weapon, and that he provided the weapon knowing it would be used to murder Brittni. There was also evidence that Davis helped Elliott set up his alibi, that he selected the grave site, that he helped dig the grave, and that he helped determine it was big enough to hold Brittni's body. There was also evidence that Davis helped Elliott with concerns about hair and blood that might result from the murder, that Davis provided plastic from his employment to hold the weapon and to protect the car. There is no doubt that this evidence would be more than sufficient to submit the issue to the jury and to support a jury's verdict that Davis was an accomplice. However, the bulk of this evidence was provided by the testimony of Elliott, who murdered Brittni. Under the State's case, Elliott was therefore an accomplice.

The testimony of an accomplice must be corroborated before a defendant may be convicted of a felony. *Barnett v. State*, 346 Ark. 11, 53 S.W.3d 527 (2001). Arkansas Code Annotated, section 16-89-111(e)(1)(A-B) (Supp. 2001), provides that a conviction cannot be had in any case of a felony upon the testimony of an accomplice unless it is corroborated by other evidence tending to connect the defendant with the commission of the offense and, further, the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.

We must therefore consider what corroborating evidence was offered in this case. As already noted, Dr. Charles Paul Kokes expressed the opinion that Brittni died as a result of seventeen blows to her head. Further, Davis's father testified that he had a bar of aluminum on which he had fashioned a handle that appeared to be State's Exhibit 3, the murder weapon. He further testified that he had checked his home after the murder and found the bar of aluminum was missing. This evidence corroborates Elliott's testimony that Davis provided the murder weapon.

A grave was dug prior to the murder. Davis admitted in a statement to police that Elliott told him of his intent to kill Brittni, and that Elliott took him out to dig the grave. He also admitted that he helped dig the grave, although he asserted that he tried to convince Elliott not to kill Brittni. John Bishop of the Arkansas State Police testified that there were two sets of footprints at the grave site. This evidence corroborates Elliott's testimony that Davis helped him prepare for the murder in getting ready to dispose of the body.

Bishop also testified that Exhibit 25 was plastic that held the weapon after its use and that the plastic had hair and blood on it. Foster Bailey, manager of the Kroger store, testified that Exhibit 25 was the type of plastic used in the store and that while such plastic is occasionally given to the public, it is generally only accessible to employees. Bishop also testified that Exhibit 34 was a roll of plastic that he obtained from the floorboard of Elliott's blue Toyota, and that he obtained a similar roll from Kroger. Bailey testified that Exhibit 34 was a roll of trash liners or bone liners that were used in the store and which were available to employees in the break room. This evidence corroborates Elliott's testimony that Davis assisted him in planning so as to avoid evidence that could connect him to the murder.

Elliott's status as an accomplice was challenged by Davis. Therefore, the jury was instructed pursuant to AMCI 403 that they were to determine whether the corroborating evidence offered was sufficient. While not every aspect of Elliott's testimony is corroborated, the evidence noted goes well beyond merely showing that the offense was committed and the circumstances thereof. Evidence offered through witnesses other than Elliott corroborates that Davis provided the weapon, helped dig the grave, and provided materials to protect Elliott's car from evidence that might be generated by the crime. In short, the corroborating evidence shows that Davis was an active participant in the crime. Thus, there is no merit to the claim of insufficiency of the evidence.

*Refusal to Release on Bond*

■ Davis argues the trial court erred in refusing to grant him release on bond pending his trial. Because we affirm his conviction, the question of his pretrial bond is moot. *Shields v. State*, 348 Ark. 7, 70 S.W.3d 392 (2002). This court does not decide moot issues. *See, K.S. v. State*, 343 Ark. 59, 31 S.W.3d 849 (2000).

*Motion to Transfer to Juvenile Court*

■ Davis next argues that the trial court erred in failing to transfer his case to juvenile court. For criminal prosecutions commenced after May 1, 1995, an order granting or denying transfer of a case from one court to another having jurisdiction over juvenile matters must be challenged by way of interlocutory appeal. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *Hamilton v. State*, 320 Ark. 346, 896 S.W.2d 877 (1995). An appeal of such order after conviction in circuit court is untimely and will not be considered. *Sanford, supra.*

*Photographs*

■ Davis argues for his next point that the trial court erred in admitting two photographs of Brittni's body at the crime scene. He argues there was no issue whether Brittni was murdered, and that the photographs were inadmissible because Davis was being tried as an accomplice. He argues that the photographs failed to make it more or less likely that he was an accomplice. Davis argues that the photographs were not relevant to any fact in question. The fact that Davis did not administer the blows does not make the photographs irrelevant because he is liable for the conduct of his accomplice. *Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986).

■■ The verdict placed before the jury asked for a determination of whether Davis was guilty of capital murder. He was accused of helping to plan and carry out the premeditated and

.deliberated murder of Brittni Pater. Brittni was so murdered. This court recently stated:

> The admission of photographs is a matter left to the sound discretion of the trial court. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). When photographs are helpful to explain testimony, they are ordinarily admissible. *Id. (citing Williams v. State*, 322 Ark. 38, 907 S.W.2d 120 (1995)). Further, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. *Id.* Other acceptable purposes are to show the condition of the victims' bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). Absent an abuse of discretion, this court will not reverse a trial court for admitting photographs into evidence. *Id.*

*Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001). The challenged Exhibits, Nos. 14 and 17 were introduced into evidence during the testimony of Arkansas State Police Investigator Bishop. Bishop testified that he took the two photographs, and that Exhibit 14 was taken in part to show the wounds Brittni suffered. He testified that Exhibit 17 was taken from further away and shows the area including the tire track where Elliott ran his car over her head. Photographs are relevant to corroborate testimony. *Berry, supra.* Dr. Kokes referred to Exhibit 14 in describing injuries Brittni suffered. The photograph was relevant on this point. *Id.*

 As an accomplice, Davis was accused of participating in the crime of capital murder. Dr. Kokes used one photograph to explain Brittni's injuries. This photograph corroborated the nature of the blows that Elliott testified he administered with the aluminum bar he was given by Davis. That same photograph, as well as the other photograph, were used by Bishop in explaining

the crime scene. Both photographs were relevant to the crime alleged. Both photographs corroborated that the crime was carried out in a manner consistent with the plans Elliott testified he and Davis developed. The probative value of the photographs outweighed the danger of unfair prejudice. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001). The issue is not so narrow as Davis argues. We hold no abuse of discretion occurred.

*Letter*

Davis asserts that the trial court abused its discretion in refusing to admit a handwritten letter from Elliott to Davis which contains the statement:

> I'm sorry you're in here. I'm sorry for how I lied about all this shit, but it's too late. I hope you will forgive me for all I've done. By the way, you're still my friend aren't you.

Davis intended to use the letter to impeach Elliott in his testimony regarding Davis's involvement in planning the murder. There is no doubt that if the jury believed the letter sought Davis's forgiveness for implicating him in the murder when he actually was not involved, it could have had a profound impact on the jury's decision of whether Davis was an accomplice.

The State argues that the letter more likely addressed Elliott's prior inconsistent statements to police regarding whether or not he had sex with Brittni. The State does not offer a convincing argument as to why Elliott would apologize to Davis for such an inconsistency. Further, the letter makes no reference to sex.

When Davis tried to use the letter to impeach Elliott, the trial court ruled it inadmissible hearsay. At the later proffer, the trial court stated, "The most basic problem that the court has with all the arguments for the introduction of this document is that I have a serious, serious question as to the authenticity of the document." The trial court further stated that the letter could have been and should have been submitted to a handwriting expert and on the basis of a lack of authentication the court denied admission.

A cursory examination of the letter reveals that it contains an erasure and change in wording in the above quoted critical language. The letter is written in pencil. Erasures and changes can be readily identified in at least six additional locations in the letter.

Within the quoted critical language noted above, it appears that where the word "all" appears, there was once a word there that began with an "e." It appears that just before the word "lied," there was once a word that contained a "y." The word "lied" stands out slightly, appearing as if the lead were darker there, or perhaps that it was written on a different surface. The letter "d" in the word "lied" appears to have a tail, which might be part of the "d" or part of another letter that was once in that same location.

Elliott testified as follows:

Q. All right. Is that your handwriting?

A. For the most part, yes.

Q. All right. And did you write that letter?

A. I, I believe — I remember — I remember writing the better part of it. Yes, sir. I'm pretty sure I wrote that.

* * *

Q. Now, you say that you recall writing part of that letter. Let's just get to it: What part of the letter do you think you didn't write?

A. Well, I'm not sure, but the last little part of the sentence in the fourth paragraph uses the word, "aren't—

Q. Uh-huh (yes).

A. —which I avoid words like that, because I never do get them right. I can't remember if they need an E in them or not.

Q. Okay, thank you. Any other parts of that letter that you think you didn't write?

A. Well, like I say, I'm not sure if I did or did not, but the second sentence has the word, "lied," in it and—

Q. The second sentence of what paragraph?

A. Of the second to the last.

Q. Okay. All right.

A. It has the word, "lied" in it and it's not how I make my D's. I don't curl the end of my D's like that.

Q. Uh-huh (yes). Okay. So what are you telling me about that word "lied?"

A. I'm not telling—

Q. Did you write that?

A. I'm not positive if I did.

Q. You might have written it?

A. I might have.

Q. Okay. Anything else that you aren't certain about, whether you wrote that letter or part of that letter."

A. No, sir, not that I can see.

 On appeal, we will not reverse a trial court's ruling on the admission of evidence absent an abuse of discretion. Nor will we reverse absent a showing of prejudice. *Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000). In evidentiary determinations, a trial court has wide discretion. *Monk v. State*, 320 Ark. 189, 895 S.W.2d 904 (1995); *Utley v. State*, 308 Ark. 622, 826 S.W.2d 268 (1992).

 On the issue of authentication, Rule 901(a) of the Arkansas Rules of Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Subsection (b) of the Rule provides, in part, as follows:

(b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) *Testimony of a witness with knowledge.* Testimony of a witness with knowledge that a matter is what it is claimed to be.

(2) *Nonexpert opinion on handwriting.* Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

(3) *Comparison by trier or expert witness.* Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

\* \* \*

The requirements of authentication and identification under Rule 901 are satisfied where the trial judge in his discretion is satisfied that the physical evidence presented is genuine and in reasonable probability has not been tampered with. *Guydon v. State*, 344 Ark. 251, 39 S.W.3d 767 (2001).

The trial court was presented with a letter that the writer acknowledged was his, but which contained words the writer was not sure were his, although he thought the words might be his. There was also one word the writer stated had a "d" in it which was not written as he wrote the letter "d". However, the writer stated he nonetheless might have written the "d".

 Under Rule 901, Davis was free to offer evidence to support his claim of authenticity and dispel the confusion the trial court found. Davis offered no evidence that the entire letter was written by Elliott, either by testimony of a witness with knowledge, a non-expert on handwriting, or an expert on handwriting as allowed under the Rule. Under these facts, we cannot say that the trial court abused its discretion in excluding the letter upon finding that there was a reasonable probability it had been tampered with. We note that the State also argued the letter should be excluded on the basis of hearsay, surprise and harmless error.

 Because we hold the trial court did not err in denying admission based upon authentication, we do not reach the other issues of admissibility. Authentication of a document is a condition precedent to admissibility. Ark. R. Evid. 901(a). It is only once *prima facie* evidence of a document's authenticity has

been offered that the document is authenticated against the parties for purposes of determining admissibility into evidence. 29A Am. Jur. 2d *Evidence* § 1034 (1994). This is so because before a discussion of hearsay may be undertaken it must first be determined that the document is what it is purported to be. In other words, if, as in this case, the document is not shown to be authentic, it is not relevant, and whether the document constitutes hearsay does not even come into consideration. For example, in *Ruiz v. State*, 299 Ark. 144, 772 S.W.2d 297 (1989), the appellant objected to certain documents because they were not authenticated and because they constituted hearsay. This court determined that they were authenticated and then determined that the documents were not subject to a hearsay objection. The requirement of authentication is separate from the requirement that a hearsay document must satisfy the applicable hearsay exception for admissibility. *Columbia Mutual Insurance Company v. Patterson*, 320 Ark. 584, 899 S.W.2d 61 (1995).

### Hostile Witness

 Davis next argues that the trial court abused its discretion in declaring Elliott a hostile witness and allowing the State to ask leading questions. The State moved twice for a declaration by the trial court that Elliott was a hostile witness. The first motion was denied. On the second motion, the trial court concluded that Elliott was not volunteering any specific facts other than those elicited through the questions asked. The trial court further stated that it appeared to the court that Elliott was speaking in generalities as opposed to giving specific details, and on that basis the motion to treat him as a hostile witness was granted. In *Swaim v. State*, 257 Ark. 166, 514 S.W.2d 706 (1974), this court stated:

> The determination whether a witness is hostile is to be made by the trial judge, in the exercise of a sound judicial discretion and may be based upon such circumstances as the demeanor of the witness, his situation and relationship to and with the parties, his interest in the case and the inducements he may have for withholding the truth. *Sinclair v. Barker, supra*; III Wigmore on Evidence (Chadbourne Rev.) 167, (1970) 774; 4 Jones on Evidence

(6th Ed.) 97, 24:12 (1972). *See also, Rossano v. Blue Plate Foods, Inc., supra; Superior Forwarding Co. v. Sikes, supra.* The mere fact that Brewer was cooperating with the police in investigating suspected illegal drug activities did not necessarily make him so hostile to the defendant that the trial judge had no discretion in determining whether leading questions were allowable.

*Swaim,* 267 Ark. at 172–173. Based upon the answers given, and the demeanor of the witness, the trial court declared him to be hostile. We find no abuse of discretion.

## Posttrial Motions

Davis finally argues that the trial court erred in refusing to hear his posttrial motions for judgment notwithstanding the verdict, for a new trial, and for a reduction in sentence. He filed his motions on November 21, 2000. The motions were set for hearing on December 4, 2000, but pursuant to agreement of the parties, the hearing was not held until January 17, 2001, to accommodate time required for testing and expert examination of the letter discussed above. At the hearing on January 17, 2001, the trial court determined that it lacked jurisdiction to hear the posttrial motions because more than thirty days had passed since their filing which meant they were deemed denied pursuant to Ark. R. Crim. P. 33.3. Rule 33.3(c) provides, "If the trial court neither grants nor denies a post-trial motion or application for relief within thirty (30) days after the date the motion or application is filed, the motion or application shall be deemed denied as of the 30th day."

The posttrial motions were deemed denied on the 30th day. Therefore, there was nothing to be heard on the motions on January 17, 2001.

## Arkansas Supreme Court Rule 4-3(h)

The transcript of the record in this case has been reviewed pursuant to Rule 4–3(h). Rule 4–3(h) requires that in cases of sentences of life imprisonment or death, we review all prejudicial errors in accordance with Ark. Code Ann. § 16-91-113(a) (1987). None have been found.