BRANDON J. HARRISON, Judge
Chad Graham was accused of engaging in sexual intercourse and deviant sexual activity with his teenage daughter, D.C., on multiple occasions in his Elkins, Arkansas, home and in his Fayetteville, Arkansas, barbershop. A circuit court, sitting as the trier of fact, convicted Graham of committing two counts of rape and sentenced him to two concurrent twenty-year terms of imprisonment in the Arkansas Department of Correction.
On appeal Graham does not challenge the sufficiency of the evidence that the State presented or the circuit court's finding of guilt. Instead, he argues that the court abused its discretion when it admitted a photograph. The photograph depicted a screenshot; and the screenshot was of text messages that were stored on a separate cellular phone from which the screenshot had been taken. Graham complains that the cellular phone belonging to D.C., the victim, was in the State's constructive possession and that the State's failure to produce D.C.'s cell phone violated his constitutional rights under the Fifth and Fourteenth Amendments as applied by the United States Supreme Court in Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and related cases. He also claims that the circuit court should not have referred to his daughter, D.C., as a "victim" during the bench trial and that the circuit judge should have recused from the case. We affirm the circuit court's judgment.
I.
Graham primarily challenges the court's decision to admit as evidence State's exhibit no. 1, which is an 8 x 11 inch piece of paper. Printed on that paper is what appears to be a cellular phone's screen that displayed a text message. At the top of the phone's screen (the one whose screen is being photographed by a separate cell phone) appears "Dad 4798718639." A third of the way down the screenshot appears "Tue, 2016/07/26." On the left side of the screenshot are lines that look like cracks across a cell phone's physical screen or cover. Below the date appear four text bubbles in alternating colors of yellow and blue:
• "Want to make some money 2:59 AM" (yellow)
• "How 3:00 AM" (blue)
• "Let me inspect 3:01 AM" (yellow)
• "No 3:02 AM" (blue)
Graham argues that the exhibit was inadmissible for several reasons and that he was "profoundly prejudiced" by its admission during the trial.
Challenges to the admissibility of evidence are left to the sound discretion of the circuit courts, and we will not reverse a circuit court's ruling on admissibility unless *32 there has been an abuse of discretion and a showing of prejudice. Gulley v. State , 2012 Ark. 368, at 10, 423 S.W.3d 569, 576-77 (citing Davis v. State , 350 Ark. 22, 86 S.W.3d 872 (2002) ). The abuse-of-discretion standard "is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration." Grant v. State , 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004).
Having considered the record, the parties' arguments, and the law, we hold that any error in the circuit court's admission of State's exhibit no. 1 did not prejudice Graham. See Pigg v. State , 2014 Ark. 433, 444 S.W.3d 863 (evidence of guilt was such that no need to decide evidentiary issue raised). In other words, we see no reasonable probability of a more favorable verdict for Graham had the circuit court decided to exclude the challenged exhibit. Sparkman v. State , 91 Ark. App. 138, 148, 208 S.W.3d 822, 829 (2005). That is not to say that we do not appreciate the importance of Graham's arguments in this digital world that we now all inhabit. How courts deal with the admissibility of electronic-based communications and digitally generated and stored information is a grave and potentially outcome-determinative matter.
Here, the exhibit was admitted over Graham's objections during the testimony of Amber Dunn, D.C.'s mother. Dunn testified that she read text messages on D.C.'s old phone, which prompted her to call her daughter (who was then at her father's residence) and ask her about the so-called inspection text, which ultimately resulted in D.C.'s telling her mother that her father "had been touching her." D.C. testified during the bench trial and said that she had received text messages from her father and that the phrase "let me inspect" meant that he wanted to have sex with her. She further testified that although she said no, Graham came to her room and had sex with her immediately after sending the text messages depicted in exhibit no. 1. D.C. also said that an inspection meant that Graham would clean her vagina with a rag and that he used the word "inspect" often when referring to that activity. So "inspection," according to D.C., was code for sexual grooming and sexual activity. D.C.'s trial testimony detailed many other "inspections" and incidents of rape at various locations that occurred while living with her father in northwest Arkansas. We therefore conclude that any error in admitting the exhibit containing the text messages was harmless given that D.C.'s testimony touched directly on the same topic as the one depicted in the photographed text messages. See Wright v. State , 368 Ark. 629, 249 S.W.3d 133 (2007) (evidentiary error is harmless if the same or similar evidence is otherwise introduced).
II.
Graham also challenges the State's failure to produce D.C.'s cell phone during discovery. Here are the contextual details.
On 19 March 2018, Graham filed a motion in limine and a supporting brief. The copy of this document that is in the record is redacted and difficult to decipher in places because it does not identify specific people. For example, one sentence states, "Therefore, ___ phone has been through the hands of _____ between July 26, 2016 and November 26, 2016." In his motion, Graham complained that the important text-message exchange was reportedly produced to investigating officers on 26 November 2016. Graham wanted to examine D.C.'s cell phone. The cell phone had not been produced to defense counsel nor was any information provided by the prosecuting attorney to defense counsel regarding the make or model of the phone *33 or the phone number assigned to it. The text messages that D.C. reportedly received on her cell phone-and were allegedly sent to her by Graham-were referenced in the (1) police report, (2) the child-safety interview, and (3) the affidavit supporting Graham's arrest warrant. Graham asked the circuit court to exclude any evidence of the text messages because the phone itself had not been produced.
On 31 March 2017, Graham filed a discovery motion and asked the State to permit an "inspection, testing, copying and photocopying of any relevant material" connected to any specific statements from him and to police reports or other evidence, including photographic evidence, that the State intended to use against him at trial.
Almost one year later, on the day of trial, Graham argued to the circuit court, "I don't know what happened to the cell phone. I think that if they [the State] are going to use evidence that was produced on a cell phone, that we had a right to examine that cell phone and as far as I know it was never collected or seen or viewed by law enforcement officers." He asked the court to exclude all evidence obtained from D.C.'s cell phone as a result, including the screenshot that was used as State's exhibit no. 1. The court denied his motion.
There were contradictory accounts of who took the screenshot of the text messages. For example, during cross-examination D.C. testified that a police officer handled her cell phone and took a picture of her phone "from his phone." She also said that she had left an old cell phone in Oklahoma with her sister on a previous visit, that her mom had read the texts on her old phone, and that her mom brought D.C.'s old cell phone from Oklahoma to Elkins and handed D.C.'s phone to a police officer.
On redirect, D.C. said that she had "like three" cell phones when she was living with her father and that she had given her sister her (D.C.'s) old cell phone. D.C. equivocated when asked whether she was sure that her mother, Amber Dunn, had D.C.'s cell phone with her when she took D.C. to the Elkins Police Department. "I could have swore I remembered it being there, but it might not have been."
Dunn said that she (Dunn) took the picture of D.C.'s phone in Oklahoma while D.C.'s phone screen displayed the disputed text messages. Dunn also said that she had left D.C.'s phone in Oklahoma after she had taken the screenshot of the texts and did not take D.C.'s phone to Arkansas. D.C.'s cell phone therefore stayed in Shawnee, Oklahoma, according to Dunn's testimony. Dunn said that she had instead simply kept her own cell phone, which had stored in it an electronic image of some text messages that had been received by D.C.'s cell phone.
The investigating officer testified, but he did not mention D.C.'s cell phone. He said that based on information provided by the Elkins Police Department, he had sent a case file to the prosecutor's office to request additional charges.
At the end of the State's case-in-chief, Graham moved to dismiss the rape charges based on Brady , supra , and Arizona v. Youngblood , 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), arguing that the State failed to preserve the cell phone as potentially exculpatory evidence. Graham recounted D.C.'s testimony that the phone was photographed by an Elkins police officer and that Dunn had taken D.C.'s phone to the police department. Graham's main argument to the circuit court was:
However you slice it, the defense was 100 percent deprived of any opportunity *34 to look at that phone, analyze that phone, get any new information from it. It had been through a number of hands in between [D.C.'s] and Elkins PD or Ms. Dunn, and the fact that the Defense has been unable to do additional research regarding that phone and find exculpatory evidence on it violates [ Brady and Youngblood ].
....
At this point and throughout this proceeding, no one has known where this phone is. No one has even testified or knows who the provider to that phone is. And the Defense has had zero opportunity to do anything to assist itself in its defense against that screenshot of a text message[.]
The court denied Graham's motion to dismiss. It ruled that the State "was never in control of the phone to produce the phone under Brady to show inculpatory or exculpatory evidence." In doing so, the court credited Dunn's testimony.
Here, Graham argues that the court's denial of his motion to dismiss based on discovery violations was reversible error because the cell phone was "available" to the State but not the defense before the trial. (No chain-of-custody argument is at issue.) In his view, a constitutionally significant discovery violation occurred because the State "constructively possessed" D.C.'s cell phone.
The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose evidence that is "material" to the guilt or punishment of the accused. Brady , 373 U.S. at 87, 83 S.Ct. 1194. In addition to the State's duty to disclose material favorable to the defendant, the Due Process Clause also imposes a limited duty on the State to preserve evidence. See Youngblood , 488 U.S. 51, 109 S.Ct. 333. The prosecutor in every case must therefore make an objective, threshold decision about whether the State must provide evidence to the defense; and an individual prosecutor has the affirmative duty to learn about the existence of any potentially exculpatory or impeachment evidence known to governmental actors, including the police. Newman v. State , 2009 Ark. 539, 354 S.W.3d 61 (citing Strickler v. Greene , 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ).
To establish a Brady violation, Graham must satisfy three elements: (1) the evidence at issue must be favorable to him, either because it is exculpatory or because it can be used to impeach a witness; (2) the evidence must have been suppressed by the State (willfully or even inadvertently); (3) and some prejudice must have ensued. Henington v. State , 2018 Ark. 279, at 3, 556 S.W.3d 518, 522. The question is not whether Graham would more likely than not have received a different verdict with the sought-after evidence in hand. The question is whether, in its absence, he received a fair trial. A fair trial in this context means one that resulted in a verdict worthy of confidence. Kyles v. Whitley , 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The Arkansas Supreme Court has recently stated that the standard of review on direct appeal for an alleged Brady violation is an abuse of discretion. Duck v. State , 2018 Ark. 267, at 7, 555 S.W.3d 872, 876.
Though Graham's concern and arguments give us pause, we nonetheless hold that he has failed to meet the Brady or Youngblood standards; therefore, the circuit court did not abuse its discretion when it denied him relief. We cannot say that the circuit court's finding that D.C.'s phone was not possessed by the State was legally wrong. Conflicting evidence was presented to the court regarding the location and *35 whereabouts of D.C.'s phone (and which one of the potentially three phones that she may have possessed at one time or another). The circuit court credited Dunn's account that D.C.'s cell phone was never handed to a police officer and that the phone remained in Oklahoma after D.C. had given it to her sister. And even if a police officer had photographed the text messages on D.C.'s cell phone, which she at one point described during her testimony, there was no evidence that the failure of the police to collect and store the cell phone was done in bad faith. Youngblood , 488 U.S. at 58, 109 S.Ct. 333 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Further, D.C.'s testimony, when fully considered, separately and amply enough covered the same topic that the admitted photograph (exhibit no. 1) depicted. For these reasons, we find no reversible error regarding Graham's Brady challenge.
III.
As another matter, Graham argues that the circuit court erred when it referred to D.C. as a victim during the bench trial. In a motion in limine filed before the trial, which the circuit court denied, Graham asked the court to refrain from calling D.C. a victim "during the trial" because it "would improperly signal to the jury that the prosecutor and/or State witnesses holds a personal belief in the credibility of her claims." (Emphasis added.) First, there was no jury trial. Second, it suffices to say that the word "victim" was primarily used by the court during discussions about elements under the rape statute that the State charged Graham with violating. E.g. , Ark. Code Ann. § 5-14-103(a)(4)(A)(i) (Repl. 2013) ("[Victim] is a minor and the actor is the victim's ... [g]uardian"). In fact, Graham's counsel himself used the word "victim" in his motion to dismiss the rape charges. There was no reversible error.
Graham also contends that the circuit court's reference to D.C. as a victim required the judge to recuse herself, but he never moved for recusal. He is therefore barred from making this argument now. Dolphin v. Wilson , 328 Ark. 1, 942 S.W.2d 815 (1997) (holding that a party cannot raise a failure-to-recuse issue for the first time on appeal).
IV.
We affirm Graham's convictions and the related sentence.
Affirmed.
Abramson and Murphy, JJ., agree.