Cite as 2021 Ark. App. 422

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CR-21-7

| | | |
|---|---|---|
| ANDRA CROCKETT | | OPINION DELIVERED November 3, 2021 |
| | APPELLANT | |
| | | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47BCR-19-107] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE RALPH WILSON, JR., JUDGE |
| | | AFFIRMED |

## ROBERT J. GLADWIN, Judge

On September 30, 2020, Andra Crockett was convicted in the Mississippi County Circuit Court of first-degree murder and first-degree battery, and he was sentenced to 130 years' imprisonment. On appeal, he argues that the State failed to present substantial evidence to support his murder conviction, and he claims that the circuit court abused its discretion by admitting electronic messages. We affirm.

I. *Procedural History and Pretrial Hearing*

On March 20, 2019, Crockett was charged by felony information with first-degree murder, first-degree battery, and possession of a firearm by certain persons. The State alleged that Crockett had killed Priscilla Aldridge and seriously injured Kelvin Thomas by shooting them. The State also alleged that Crockett is a habitual offender, having five prior felony convictions, and that his sentence should be enhanced for committing a felony

involving the use of a deadly weapon. The circuit court severed the possession charge from the trial on the other charges. Ark. R. Crim. P. 22.2 (2020).

A pretrial hearing was held on Crockett's "Motion to Exclude Text Messages" which refers to certain electronic messages generated through SmartJailMail and are allegedly attributed to Crockett. First, Crocket argued that the State had to meet the authentication requirements under Rule 901 as a condition precedent to the electronic messages' admission. Ark. R. Evid. 901 (2020). Second, he claimed that the State had to prove that the messages were authored by him or that they should be excluded as hearsay. Ark. R. Evid. 801 and 802 (2020). Third, he claimed that the messages are hearsay and that cross-examination of a witness would be necessary to establish the authenticity of records as attributable to him. He argued that such evidence is "testimonial" and, therefore, violates his Sixth Amendment right to be confronted with the witness against him.

At the hearing, jail administrator Captain Charles Bo McCollum testified that inmates at the county jail are assigned a jacket number. "[The number] generates in the computer to the JailMail, and then when they go to the pod or the block that they're in, they can go to the kiosk, and they have to put a password in, and then they get the rules and all of that to get signed on." He said that each inmate has his own number and that each inmate chooses his own password, and it costs fifty cents for each "text." McCollum said that Crockett had not complained that anyone else had used his account but that it is possible for inmates to obtain other inmates' passwords. McCollum identified an email generated from the jail's kiosk, and it reflects that Crockett was the author and sender, and it contains Crockett's inmate number.

2

Jenna Copeland works at the Mississippi County Sheriff's Department, and she testified at the hearing that she keeps the books on the commissary accounts for the inmates. She said that Crockett had $48.50 placed in his commissary account on March 9, 2019, at 9:20 a.m. She said that the commissary account is separate from the SmartJailMail account.

The State argued to the court that Copeland's testimony was necessary to establish a timeline—in the email, Crocket states that he had no money on March 8, and he requested $40 from "KK." On March 9, $48.50 was placed in his commissary account. The State claimed that the email was relevant because it also contains Crockett's incriminating statements that "it's f--d-up 'cause I knew if I ain't got help this BS would happen; that's what bothers me; I convinced myself I could fight these demons with no help; this is the first time I've done anything I regret; this ain't no shit I would do to a woman or a brother; Ashley, this shit bother me like crazy; and I can't fix this."

The circuit court ruled,

> All right, a 1986 case, *White v. State* indicated, that's a Supreme Court case of Arkansas, says to prove authenticity the State must demonstrate a reasonable probability that the evidence has not been altered in any significant manner. Admission of evidence is always within the sound discretion of the trial court, and trial courts don't get reversed unless there's an abuse of discretion, unless it violates some federal or state constitutional right.

> In this case, based on what I've seen and heard and thinking along the lines that Mr. Walker mentioned, this is a limited environment, a limited number of persons who would have access to this. Inmates, according to Mr. McCollum, have their own inmate number and they're assigned that when they're logged into the jail.

> Secondly, the inmates create their own personal, unique, specific passwords. So, I think the State, at this point, has made a case that this has not been tampered or altered and the Court finds that, based on what I've seen, based on Exhibits 1 and 2, two establishing the timeline and the money put in the commissary account and one being the document itself, the communication itself to Ms. Ashley Farmer and the statements contained therein, lead one to believe that would've been from, the

3

author would've been the Defendant in this case. So, I think the State's met its burden of proof as to authenticity.

The second issue, the hearsay, this falls under Rule 801(d), sub (2), admission by party opponent, and since this is the Defendant's own admission, the Court doesn't find that's hearsay as a matter of law, pursuant to rule 801, 801(d)(2). So, I'm going to deny the motion in limine at this point.

## II. *Jury Trial*

After the jury was sworn, Blytheville police officer Carle Treadway testified that on March 6, 2019, he was dispatched to 1909 West Ash Street to investigate a shooting. When he arrived, he saw a black male on his hands and knees on the sidewalk next to the front steps of the residence. The front door was open, and there was a couch and a chair turned over in the doorway. The man on the sidewalk said that he had been shot in the left leg. Treadway said that a female voice called from inside the house, and he went inside and found a woman lying face down with a gunshot wound to her lower back, and he saw a revolver and some narcotics near the couch. He said that Officer Murray gave the woman medical attention and that he walked outside and secured the crime scene. Treadway said that the male victim outside was Kelvin Thomas. While talking to Thomas, Treadway found a Glock pistol in a trash can next to the front door, and it was collected as evidence. Both victims were transported to the hospital. On cross-examination, he said that Thomas was within five feet of the gun found outside in the trash can and that Thomas told him that he did not know who shot him.

Blytheville police officer Josh Murray testified that he responded to the scene with Treadway and that he rendered aid to the injured woman, Priscilla Aldridge. He found her lying in the living room, and he saw several shell casings, a gun, and marijuana on the floor.

4

He asked Ms. Aldridge who had shot her, and she answered but did not give him "information within which [he] could develop a suspect." He stayed with her until the ambulance crew arrived and talked to her the whole time. On cross-examination, he said that she told him that she and Thomas had been the only people in the house and that someone knocked on the door. She came from the back when someone knocked, and after that, she was not sure what happened other than someone was shooting.

Thomas testified that he is Crockett's brother and that Crockett moved in with him two months before this incident. On March 6, Ms. Aldridge picked him up around 10:00 p.m., and before he left, Thomas agreed to get food from Taco Bell for Crockett. Thomas explained that the line at Taco Bell was long, so they went to Walmart. When they returned to Taco Bell, it was closed. He said that Crockett had told him that if he could not get food at Taco Bell that he should get "anything" from Hardee's. Thomas said they bought food at Hardee's and took it to Crockett, who became upset because the sandwiches were dressed in mayonnaise.

Thomas testified that they argued, and he told Crockett that he did not have to eat the food. Thomas said that their argument escalated, and Crockett shot him and said, "Look what you made me do." Thomas said that he screamed for help, that Crockett shot him twice more, and that he passed out for a second. Right before passing out, Thomas heard some shots, but he did not see anything. When he woke up, Crockett was carrying him over his shoulder, taking him outside. Thomas then said, "[Crockett] still had the pistol and I guess he dropped it." He said that Crockett threw him on Aldridge's car, "busting out her window," but Thomas could not remember anything after that. He said that when he

5

woke up, he saw the gun and that Crockett was gone. Thomas saw his neighbor and told him that he needed help because he had been shot. The neighbor said, "There's a gun right there." He told the neighbor not to leave. He said that he was confused and threw the gun in the trashcan. After that, he passed out until the police arrived. He said that he endured a three-hour surgery, that he has "a fake hip and a fake pelvis," and that he cannot ride a bike or run anymore. He said that the gun found in the house belonged to him. He said that he was confused and hurt when he first talked to police and that he lives by the "street code."

Blytheville police detective Chelsey Grimes testified that she was asked to go to the hospital on March 6 and speak to the victims, and when she arrived, Ms. Aldridge was still alive. Ms. Aldridge said that she had been at Thomas's house, that she went with Thomas to Hardee's and Walmart, and that they returned to his house. She said that she did not know who had shot her, that Thomas did not shoot her, and that he had been shot as well. After talking with Ms. Aldridge, Grimes went to the crime scene and took photographs of Ms. Aldridge's vehicle, which had bullet holes in it. She photographed evidence inside the house, which included Ms. Aldridge's personal items; cocaine; a .38 Smith & Wesson revolver; a jar and a small baggie of marijuana; a comforter with blood on it; several .40 caliber bullets; a broken telephone found near where Thomas had been lying; and Crockett's Social Security card. Grimes collected a DNA swab from Crockett, diagrammed the scene, and contacted Terra Coleman, Thomas's ex-wife. On cross-examination she said that a neighbor, Jarrid Jones, stated that he was next door at a "bootleg house" when the shooting occurred and that Crockett, Thomas, and Ms. Aldridge were together at Thomas's house.

He told her that he had joked with Ms. Aldridge and Thomas about them not getting him some fast food.

Dr. Adam Craig, associate medical examiner at the Arkansas State Crime Laboratory, performed the autopsy on Ms. Aldridge, who was thirty-seven years old and died of a gunshot wound to the abdomen. Dr. Craig testified that Aldridge's manner of death was homicide. There were no bullets or fragments recovered, so Dr. Craig could not testify which gun had fired the bullet.

Deborah Britton is a forensic firearm and toolmark examiner for the Arkansas State Crime Laboratory. She testified that she had examined the two guns found at the scene—a .40-caliber Smith & Wesson Glock pistol and a .38 Special Smith & Wesson revolver—and several rounds of ammunition. She concluded that the four expended cartridge cases were fired from the .40-caliber Glock pistol. Her findings were inconclusive in regard to the two damaged bullets that were recovered. On cross-examination, she said that the two damaged bullets could have come from a gun other than the Glock. On redirect, she said that the damaged bullets could not have been fired from the revolver. Madison Harrell, a forensic DNA analyst at the Arkansas State Crime Laboratory, testified that Ms. Aldridge was excluded from the DNA found on the Glock pistol. Harrell testified that Crockett's DNA was a major component of the DNA mixture obtained from the Glock pistol, and Crockett was excluded from the DNA obtained from the revolver. Captain McCullom reiterated his testimony from the pretrial hearing about the SmartJailMail system.

Blytheville police detective Jason Simpkins testified that he spoke with Thomas inside an ambulance that was parked outside the Great River Medical Center on the night

7

of the shooting.  Thomas told him that he did not remember what had happened to him and that he did not know who shot him.  Simpkins photographed Thomas's wounds, which were two bullet holes in his hip area, and he did not perform a gunshot–residue test on Thomas.

Simpkins said that he went to the scene of the shooting and found shell casings on the wiper blade of the vehicle parked "on the left side" and one casing by the right rear tire.  He also saw the same type of shell casings on the floor inside the house, and he found a Glock pistol in a trash can beside the door.  He found fast-food wrappers from Hardee's and a comforter with blood on it hanging from the doorway to the living room.  While he was processing the scene, he learned that Ms. Aldridge had passed away.  He went back to the hospital and placed bags over Ms. Aldridge's hands to preserve DNA evidence.

Simpkins said that later that day, he and Detective Kent went to Regional One in Memphis to interview Thomas, and they received information while traveling that Crockett was the suspect involved.  Simpkins recorded the interview with Thomas, who was not forthcoming at first.  Simpkins said that he thought Thomas knew what happened and was following a street code in order to handle things with Crockett by himself.  He said that at some point, Thomas told him what happened.

Simpkins testified that while investigating, he discovered Crockett's emails to Ashley Farmer and Carly Bohannon on the jail's monitoring system.  He read the emails to the jury.  The email to Carly states,

> Carly I been trying so hard not to fail I done had so much pressure on me from not seeing my kids to n***** trying to kill me, family betraying me and some more but I swear I wasn't trying to [do] this.  I've been trying to leave for weeks to avoid doing BS but never would I imagine this the BS I would do.  I almost killed

me when I realized what I did. Carly I'm so sorry I knew I needed help was gone to go to Mid–South in December but Nuke talked me out of it. I need prayer and mental help. I can't live with this it ain't fair to the families. Tell my son I love him and I'm so sorry. Please if you can, can you get them to give me meds to cope with this it's supposed to be 'cause I'm not doing good.

I don't remember doing it but when I came to my brother was screaming why would I do this to him. I tried so hard to get him help but couldn't. I carried him to the car and realized I ain't had no keys. His words almost made me take my life in his front yard that's how they got the gun. His cries won't stop playing in my head and it's driving me. I didn't have a number that only reason I didn't I left you a message on your work phone for your birthday. Carly been going through so much with none to talk to or listen MFers been trying to kill me and some more shit I was facing too many problems on my own. I reached out to my preacher his words helped for the moment but the devil was still chasing me now he laughing at me nonstop 'cause I fucked up like you've wanted.

On cross-examination, Simpkins said that he cussed and may have used the F-word when he interviewed Thomas at the hospital in Memphis. He told Thomas that he could be prosecuted for accessory to murder, and he told Thomas that his brother had shot him.

Thereafter, the State rested its case. The defense moved for a directed verdict, and the circuit court denied the motion, finding that the State had made a prima facie case for first-degree murder and that the question was one of credibility, which was for the jury to decide. Crockett did not present any witnesses, and he renewed his directed-verdict motion, which was denied. The jury found Crockett guilty of first-degree murder, first-degree battery, and using a firearm as a means of committing the offenses.

The jury sentenced Crockett to seventy-five years' imprisonment on the murder conviction, forty years' imprisonment on the battery conviction, and fifteen years' imprisonment on the firearm enhancement. The circuit court ordered that the sentences run consecutively for an aggregate term of 130 years. This appeal timely followed.

### III. *Sufficiency of Evidence for Conviction on First-Degree Murder*

On appeal, we review a motion for a directed verdict as a challenge to the sufficiency of the evidence and will affirm the circuit court's denial of a motion for directed verdict if there is substantial evidence, either direct or circumstantial, to support the jury's verdict. *Kolb v. State*, 2021 Ark. 58, at 3.

> In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Price v. State*, 2019 Ark. 323, at 4, 588 S.W.3d 1, 4. We affirm a conviction if substantial evidence exists to support it. *Id.*, 588 S.W.3d at 4. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.*, 588 S.W.3d at 4.

> Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Howard v. State*, 2016 Ark. 434, at 12, 506 S.W.3d 843, 850. Whether the evidence excludes every other hypothesis is for the jury to decide. *Id.*, 506 S.W.3d at 850. The credibility of the witnesses is an issue for the jury and not this court. *Id.*, 506 S.W.3d at 850. A jury is not required to believe all or any part of a defendant's or witness's statement and is entitled to draw upon common sense and experience in reaching its verdict. *Price*, 2019 Ark. 323, at 6, 588 S.W.3d at 5.

*Collins v. State*, 2021 Ark. 35, at 4, 617 S.W.3d 701, 704.

Crockett argues that the circuit court erred by denying his motion for directed verdict. He claims that the evidence, when viewed in the light most favorable to the State, was not sufficient to support the verdict of first-degree murder. He argues that the State was required to prove beyond a reasonable doubt that he caused the death of Ms. Aldridge and that it failed to do so.

He argues that Ms. Aldridge told Officer Murray that she did not know who shot her. Thomas testified that Crockett shot him and that he passed out. Although Thomas heard gunshots, he never saw who shot Ms. Aldridge. The DNA analyst testified that

Crockett's DNA was found on the Glock used in the shooting. However, the testimony was that there was a DNA mixture found on the gun. While Crockett's DNA matched the major component of the DNA found, Crockett argues that there is no way to tell who last touched the gun. He argues that finding DNA on the gun does not prove who fired the gun. He also argues that the forensic firearm and toolmark examiner testified that two damaged bullets were found that could not be matched conclusively to the gun on which his DNA was found. Finally, he argues that there were no witnesses that could positively identify him as having sent the emails that include his alleged confession.

We hold that substantial evidence supports Crockett's conviction. We agree with the State's contention that Ms. Aldridge's failure to identify him as the shooter, as well as the absence of an eyewitness, does not dictate the conclusion that the proof failed to establish Crockett's guilt. The evidence was that an acquaintance, Jarrid Jones, was at a neighboring house and corroborated Thomas's testimony that Crockett, Thomas, and Ms. Aldridge were at Thomas's house shortly before the shooting. Thomas testified that after Crockett shot him, he heard more shots. Ms. Aldridge was found lying on the floor in the living room, which is where Thomas said he had been shot. Ms. Aldridge had a gunshot wound to her abdomen and an exit wound on her back. She did not identify Crockett as the shooter, and she told an officer that Thomas was not the shooter. Further, Crockett's incriminating statements and admissions in the emails corroborate Thomas's testimony and are sufficient by themselves to establish that Crockett shot Ms. Aldridge.

Further, there was sufficient evidence linking Crockett to the murder weapon. The DNA analyst concluded that the DNA recovered from the Glock pistol matched Crockett's

11

DNA. The firearm and toolmark examiner testified that the four expended cartridges and two expended bullets were .40 caliber, and the expended cartridges were discharged from the Glock pistol. Crockett's identification was found next to the unfired .40-caliber ammunition recovered from the scene. Thus, there was sufficient evidence that the Glock pistol belonged to Crockett and that it was the murder weapon.

Accordingly, the circuit court committed no error in denying Crockett's motion for directed verdict.

## IV. *Admission of Emails*

Crockett argues that the emails admitted in evidence were not properly authenticated. The Arkansas Supreme Court stated,

> Authentication of a document is a condition precedent to admissibility. *Davis v. State*, 350 Ark. 22, 39, 86 S.W.3d 872, 883 (2002). On the issue of authentication, our rules of evidence provide: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Ark. R. Evid. 901(a) (2010). Rule 901 further provides that the testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to authenticate evidence, and also that appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances can be used to authenticate evidence. Ark. R. Evid. 901(b)(1) & (4).

*Gulley v. State*, 2012 Ark. 368, at 12–13, 423 S.W.3d 569, 578.

A circuit court's ruling on the admission of evidence will not be reversed unless there has been an abuse of discretion; nor will we reverse absent a showing of prejudice. *Brown v. State*, 2019 Ark. App. 154, at 9, 573 S.W.3d 536, 541.

> Authentication requirements are satisfied if the trial court, in its discretion, concludes that the evidence presented is genuine and, in reasonable probability, has not been tampered with or altered in any significant manner. *Davis v. State*, 350 Ark. 22, 86 S.W.3d 872 (2002); *Guydon v. State*, 344 Ark. 251, 39 S.W.3d 767 (2001).

To satisfy these requirements, every possibility of tampering need not be eliminated. *Guydon, supra.*

*Bobo v. State*, 102 Ark. App. 329, 334–35, 285 S.W.3d 270, 275 (2008).

In his appellate brief, Crockett cites *Gulley, supra,* and *Brown, supra,* for the proposition that an additional requirement is necessary for authentication of text messages.

> Gulley cites this court to *Commonwealth v. Koch*, 39 A.3d 996 (Pa. Super. 2011), in support of his contention that the text messages at issue in his case were not properly authenticated. Because the text messages at issue were properly authenticated, as required by Arkansas Rule of Evidence 901, we need not look to other jurisdictions to resolve this issue. We note, however, that the *Koch* Court held that the authentication of electronic communications requires more than mere confirmation that the telephone number belonged to a particular person; circumstantial evidence, which tends to corroborate the identity of the sender, is also required. *Id*. at 1005. In the instant case, sufficient circumstantial evidence was presented to corroborate the identity of the sender.

*Gulley*, 2012 Ark. 368, at 15 n.4, 423 S.W.3d at 579 n.4; *Brown*, 2019 Ark. App. 154, at 10, 573 S.W.3d at 541–42. He contends, therefore, that showing the emails came from a particular account is insufficient to authenticate them and that sufficient circumstantial evidence must be presented to corroborate the identity of the sender.

Crockett argues that there was no testimony linking the emails to a unique "jacket number" and that there was no corroborating circumstantial evidence linking him to the emails. He asserts that Captain McCullom testified that the messages "looked like JailMail messages," and that Detective Simpkins said with no explanation that the emails were from Crockett. He claims that no recipients of the emails testified and that no one from SmartJailMail testified whether the emails were generated from its system. He argues that there was testimony from Captain McCullom that if the system is left on the kiosk, anyone could use it and that there have been instances of inmates using other inmates' passwords.

Thus, he claims that the circuit court abused its discretion by finding that the emails had been properly authenticated.

We hold that the circuit court did not abuse its discretion in admitting the emails and that sufficient circumstantial evidence was presented to corroborate Crockett's identity as the sender. The administrator of the Mississippi County Detention Center, Captain McCullom, testified at the pretrial hearing and at trial. He explained that Crockett, like all inmates, was assigned a unique inmate number when he was booked into the jail. The inmates use their unique number as their username to sign into the SmartJailMail account. The first time inmates sign into their account, they enter their inmate number and are prompted to create a password. The inmate's number and name appear on the top of the emails sent from his account. Each email costs an inmate fifty cents. Emails with Crockett's inmate number and name at the top appeared to be emails sent from Crockett's SmartJailMail account. Crockett did not report any unauthorized use of his account. Accordingly, the evidence was sufficient to authenticate the emails as it was "testimony of a witness with knowledge that a matter is what it is claimed to be." Ark. R. Evid. 901(b)(1).

Further, the emails were sufficiently authenticated on the basis of their content when considered in conjunction with the circumstances. *See* Ark. R. Evid. 901(b)(4) (examples of authentication or identification conforming with the rule are distinctive characteristics, such as appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances). The March 8, 2019 email states, "This is the first time I've done anything I regretted. This ain't no shit I would do to a woman or my brother." It also stated that there was no money in his account at the jail and that he had

14

asked friends to deposit forty dollars. Jena Copeland testified that $48.50 was deposited into Crockett's account on March 9, 2019.

Finally, Thomas's testimony was consistent with the content of the emails. Before the emails were admitted, Thomas testified that after he had been shot, he screamed at Crockett, asking him why he had shot him, and he recalled Crockett carrying him to the car and finding a gun on the ground. The email dated March 9 states that "my brother was screaming why would I do this to him. . . . I carried him to the car. . . . His words almost made me take my life in his front yard, that's how they got the gun." Thus, the contents of the emails were sufficient to authenticate the messages under Rule 901(b)(4).

Because we hold that the electronic messages were properly authenticated, we need not address Crockett's hearsay argument. Rule 801 provides that a statement is not hearsay if it is offered against a party and is his own statement. Ark. R. Evid. 801(d)(2)(i) (2020). Further, a statement made by a defendant and offered against him at trial constitutes an admission of a party opponent. *Smith v. State*, 2009 Ark. 453, 343 S.W.3d 319. Accordingly, Crockett's emails were not hearsay and were properly admitted.

Affirmed.

ABRAMSON and KLAPPENBACH, JJ., agree.

*Omar Greene*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.