Cite as 2020 Ark. 286

# SUPREME COURT OF ARKANSAS

No. CR-19-854

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered:** September 24, 2020 |
| ORLANDO DOMINGUEZ | APPELLANT |  |
| V. |  | APPEAL FROM THE HOWARD COUNTY CIRCUIT COURT [NO. 31CR-19-23] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE CHARLES A YEARGAN, JUDGE |
|  |  | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant, Orlando Dominguez, appeals his conviction of three counts of rape in the Howard County Circuit Court. For reversal, Dominguez argues (1) that the circuit court erred by denying his motion for a directed verdict, and (2) that the trial was "fatally infected" when the circuit court allowed the prosecution's lead witness to remain in the courtroom during the testimony of other witnesses and during the State's case concerning charges in which she was not a victim. Because Dominguez was sentenced to life imprisonment, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1-2(a)(2) (2019). We affirm.

On July 9, 2019, the State charged Dominguez by amended felony information with three counts of rape pursuant to Arkansas Code Annotated § 5-14-103(a)(3)(A), (4)(A)(i), and (c)(1) (Supp. 2019). The rapes were alleged to have occurred at various times before October 31, 2014, and between December 20, 2018, and January 20, 2019. The victims were Dominguez's three daughters, J.D., V.D., and D.M. The case proceeded to trial on July 29, 2019. At the time of the trial, J.D. was fourteen years old, V.D. was twelve years old, and D.M. was eighteen years old. After the jury was seated, Dominguez sought to exclude the victims from the courtroom during the trial. Dominguez argued that his defense was that the case was based on anecdotal evidence and that the victims' stories were inconsistent. The court stated that it would allow the victims to decide whether to remain in the courtroom after they testified. Shortly thereafter, the court and the parties revisited the issue with respect to D.M., who wanted to remain in the courtroom for the entire trial. Dominguez's attorney stated that he thought it would be unfair for D.M. to hear all the testimony before she testified and requested that if she remained, that she be required to testify first. The court ruled that D.M. had the right as a victim to be present and did not require D.M. to be the first witness. Although J.D. and V.D. also wanted to be present for the trial, the prosecutor asked that they stay out until after they testified.

At trial, J.D. testified first. She said that early one morning, she went to Dominguez's room to look at his phone, and he asked her to lay beside him in his bed. J.D. did so and fell asleep. She awoke when Dominguez got on top of her and began raping her. J.D. testified that his "wiener" was in her "front private area," and that when she got

2

up and went to the bathroom, her private area hurt. J.D. testified that she awoke about a month or two later to see Dominguez leaving the room and that her back private area was wet, and her bedclothes were not on correctly. On a third occasion, J.D. was asleep on a couch when she awoke to find Dominguez naked beside her with his private part inside her "back front private area." J.D. testified that her back private area was wet. J.D. testified that after the third incident, she ran to talk to D.M., who was with Melissa Morris at the time. Morris is D.M.'s mother, but is not the mother of J.D. or V.D. J.D. said that Morris did not know what had happened because they concealed the truth by telling Morris that she had stepped on a spider. She further testified that D.M. went to Dominguez's room and hit him and confronted him about abusing his daughters. J.D. heard her yelling but couldn't tell exactly what she was saying. According to J.D., she was younger than fourteen years of age on all three occasions and has not been in the home with her father since she turned fourteen. J.D. also admitted that in January 2019, she talked to law enforcement officials but did not mention the abuse because she was afraid that she would be separated from her siblings. She said that she came forward in May when she found out that Dominguez had raped V.D.

V.D. was the second witness and testified that for a time she shared a room with her two sisters. V.D. said that she once saw Dominguez naked and moving "up and down" when he was on top of D.M. She also testified that she once went into Dominguez's room to sleep and when she got into the room, he pulled down her pajama pants and put his front private part into her front private part. V.D. said that her private area felt wet after he

3

finished. According to V.D. this happened in late December or January of the year of the trial. On cross-examination, V.D. testified that she had accused her half-brother Eric of rape in January 2018 and told authorities during that investigation that Dominguez had not done anything to her.

Morris testified next. Morris did not live in the home but was staying with D.M. in her room in January 2019 when J.D. came into D.M.'s room crying. D.M. told her that J.D. was upset because she had been bitten by a spider. In reality, J.D. was telling D.M. what Dominguez had done. Morris said that she did not really talk to J.D. at that time. When D.M. went to confront Dominguez, Morris only heard her ask him what was going on and why was he "doing this." Morris also testified that she was in a vehicle with D.M. in January 2019 when Dominguez called, and she heard the conversation over the Bluetooth system. During that conversation, Morris recalled Dominguez saying that he wanted to "fuck [D.M.] all day and night." Morris admitted on cross-examination that a court had deemed her to be an unfit parent sometime before 2008 because she had left her children unattended.

D.M. testified next and said that Dominguez abused her physically because he was jealous of her boyfriend and did not want her to "cheat" on him. D.M. testified that Dominguez began sexually abusing her when she was eleven or twelve years old. She described an incident when she was playing games on his phone in his room and he got on top of her from behind. He pulled down her pajama pants and put his "male part" into her "bottom." According to D.M., Dominguez had sex with her so frequently that it "grew

normal." D.M. said that for the first two years, Dominguez had sex with her back side, but more recently it was in her front area. D.M. testified that Dominguez told her that he loved her as a daughter and a wife. D.M. went to the police after the January 2019 phone call. D.M. admitted on cross-examination that she told authorities in January 2018 that Dominguez had done nothing to her. This was during an investigation that led to her brother Eric being imprisoned for the rape of V.D. The fifth and final witness to testify was Kyleigh Dotson, a licensed professional counselor and forensic interviewer at the Children's Advocacy Center in Texarkana. Dotson testified as to her involvement in the case and the steps that child-abuse victims generally go through when disclosing the abuse.

At the close of the State's case, Dominguez moved for a directed verdict. Dominguez argued that there were no physical findings of rape, that the victims' "stories have changed dramatically, and [that] this is all anecdotal evidence." The circuit court denied the motion. Dominguez also renewed his objection regarding the victims being present during the trial. Dominguez rested without presenting evidence and renewed his directed-verdict motion. The court denied the renewed motion. The case was submitted to the jury, which found Dominguez guilty on all three counts and sentenced him to life imprisonment on each count. The information is not clear as to which count related to which victim, but the verdict forms designated D.M. as the victim for count one, J.D. as the victim for count two, and V.D. as the victim for count three. Dominguez filed a timely appeal.

Dominguez first argues that the circuit court erred when it did not grant his motion for a directed verdict because the State failed to present sufficient evidence that he

committed all three offenses contained in the information. Dominguez argues that the State's entire case consisted of five witnesses, photos of cell phone logs, and a jail recording wherein he asked D.M. to tell his attorney that no sexual activity occurred at least until she had turned eighteen. Dominguez essentially challenges the victims' credibility.

An appeal from the denial of a motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Taffner v. State*, 2018 Ark. 99, 541 S.W.3d 430. In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence. *Howard v. State*, 2016 Ark. 434, 506 S.W.3d 843. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* In reviewing a sufficiency challenge, we view the evidence in the light most favorable to the State, considering only the evidence that supports the verdict. *Fletcher v. State*, 2018 Ark. 261, 555 S.W.3d 858. This court has consistently held that the testimony of a rape victim, standing alone, is sufficient to support a conviction if the testimony satisfies the statutory elements of rape. *Mabry v. State*, 2020 Ark. 72, 594 S.W.3d 39. This is equally true when the victim is a child. *White v. State*, 367 Ark. 595, 242 S.W.3d 240 (2006). Scientific or medical evidence is not required to prove rape. *Kelley v. State*, 375 Ark. 483, 292 S.W.3d 297 (2009). Additionally, inconsistencies in the testimony of a rape victim are for the jury to resolve. *Gillard v. State*, 366 Ark. 217, 234 S.W.3d 310 (2006).

We look next to the elements of rape. A person commits the offense of rape if he engages in sexual intercourse or deviate sexual activity with another person and the person is less than fourteen years of age. Ark. Code Ann. § 5-14-103(a)(3)(A) (Supp. 2019). A person also commits rape if he engages in sexual intercourse or deviate sexual activity with another person and the other person is a minor and the actor is the victim's guardian. Ark. Code Ann. § 5-14-103(a)(4)(A)(i). "Sexual intercourse" means "penetration, however slight, of the labia majora by a penis." Ark. Code Ann. § 5-14-101(11). "Deviate sexual activity" means any "act of sexual gratification involving . . . [t]he penetration, however slight, of the anus or mouth of a person by the penis of another person; or . . . [t]he penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person[.]" Ark. Code Ann. § 5-14-101(1)(A)–(B). A "minor" is a person who is less than eighteen years of age. Ark. Code Ann. § 5-14-101(6). A "guardian" is a parent, stepparent, legal guardian, legal custodian, foster parent, or any person who by virtue of a living arrangement is placed in an apparent position of power or authority over a minor. Ark. Code Ann. § 5-14-101(3).

With these authorities in mind, we consider the evidence adduced at trial. J.D. testified that Dominguez's "wiener" was inside her front private part when she woke up in his bed one night. J.D. testified to another incident where Dominguez put his private part into her "back, front," private area. Although J.D. was fourteen at the time of the trial, she testified that she was less than fourteen when the incidents occurred. V.D., who was only twelve at the time of the trial, testified that Dominguez put his private part into her front

private part when she was in his bed. D.M. was eighteen at the time of the trial but testified that Dominguez began having sexual relations with her when she was eleven or twelve years old. D.M. testified that Dominguez put his male part in her bottom and front multiple times. D.M. said it happened so frequently it "became normal" for her. The evidence is sufficient to establish that Dominguez engaged in sexual intercourse or deviate sexual activity with each of the victims, and that it happened before they were fourteen years old. Any inconsistencies in the victims' testimony was for the jury to decide. *Gillard v. State*, 366 Ark. 217, 234 S.W.3d 310. The victims' testimony was sufficient to prove that Dominguez was guilty of rape under either section 5-14-103(a)(3)(A) or section 5-14-103(a)(4)(A)(i). Viewing the evidence in the light most favorable to the State, as we must, it is clear that substantial evidence supports the jury's verdict.

We next turn to Dominguez's second argument, which is that his trial was "fatally infected" when the circuit court allowed D.M. to remain in the courtroom during the testimony of other witnesses and during the State's case concerning the two charges in which she was not a victim. According to Dominguez, D.M. should have been allowed in the courtroom only "during those crimes in which she was a victim and those crimes in which she was not a testifying witness." Dominguez claims that D.M.'s presence throughout the trial put his right to a fair trial in jeopardy. Dominguez further asserts that he was prejudiced by D.M.'s presence during J.D.'s testimony on count two of the amended information and during Morris's testimony on count one of the amended information.

With certain exceptions not applicable here, Arkansas Rule of Evidence 615 provides in relevant part that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." Although Rule 615 addresses trial witnesses, the trial presence of a victim is governed by Arkansas Rule of Evidence 616, which provides that victims "shall have the right to be present during any hearing, deposition, or trial of the offense." We have said that the victim of the crime has a right, pursuant to Rule 616, to be present during the trial "notwithstanding Rule 615." *Lard v. State*, 2014 Ark. 1, 431 S.W.3d 249. Rule 616 "purports to leave no discretion to the trial court." *Stephens v. State*, 290 Ark. 440, 441, 720 S.W.2d 301, 302 (1986).

Dominguez contends that D.M. should have been sequestered pursuant to Rule 615. He argues that she should have been sequestered during Morris's testimony on count one of the information and during the State's case on count two of the information. Although our rules of evidence give a victim the right to be present during the trial of the crime against him or her, Dominguez contends that we have previously suggested that a court would err by allowing a victim's presence during a multicount trial involving different victims. *See Claiborne v. State*, 319 Ark. 537, 893 S.W.2d 324 (1995). In *Claiborne*, Claiborne broke into the home of Cloy Evans and robbed him. Shortly thereafter, Claiborne broke into the home of Homer and Vivian Allbritton and robbed them. At a suppression hearing, Vivian was allowed to stay in the courtroom while Evans identified Claiborne. Claiborne argued that the court erred by allowing Vivian's presence during the

hearing. This court held that because Vivian was a victim of the crimes against her and her property, she had a right to be present under Rule 616, and that she did not need to be excluded as a witness to the crimes against Evans because she was not a witness to those crimes. Although Dominguez claims that *Claiborne* suggests that we would have required Vivian's sequestration if she planned to testify with respect to the crime against Evans, we disagree. After *Claiborne*, we found no error when a victim-witness was allowed to remain in the courtroom throughout the trial even when that trial included counts relating to other victims. *Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996). Therefore, D.M., as a victim, had the right to be present during the trial pursuant to Rule 616. The mere fact that the trial of the crime against her included other counts involving other victims is not sufficient to overcome D.M.'s Rule 616 right to be present during the trial. Nevertheless, D.M.'s Rule 616 right must yield to Dominguez's constitutional rights. *See Stephens*, 290 Ark. 440, 720 S.W.2d 301.

Both the United States Constitution and the Arkansas Constitution guarantee Dominguez the right to a fair trial. *Swindler v. State*, 267 Ark. 418, 592 S.W.2d 91 (1979). Additionally, Arkansas Code Annotated section 16-90-1103(a) (Repl. 2016), provides that a victim "may" be present unless the court determines that the victim's exclusion is necessary to protect the defendant's right to a fair trial. Thus, the circuit court must sequester a victim, despite Rule 616, if it determines that the victim's presence would put the defendant's constitutional right to a fair trial in jeopardy. *See Stephens*, 290 Ark. 440, 720

S.W.2d 301. Because the fairness of Dominguez's trial is a constitutional issue, our review of this issue is de novo. *Swain v. State*, 2015 Ark. 132, 459 S.W.3d 283.

In *Stephens*, *supra*, we observed that a defendant's right to a fair trial was jeopardized in *Commonwealth v. Lavelle*, 419 A.2d 1269 (Pa. Sup. Ct. 1980). There, Lavelle was accused of forgery and attempted theft committed in the course of multiple transactions made at several branches of the Susquehanna Savings Association by a man who identified himself as Robert Mack. Lavelle's appearance at trial was markedly different from the suspect who engaged in the transactions and the identity of the perpetrator of the offenses was in question. The trial court denied Lavelle's motion to sequester tellers who had interacted with the suspect and were witnesses. Five tellers testified after police officers identified Lavelle as the perpetrator, and some of the tellers testified after other tellers. The Superior Court of Pennsylvania concluded that

> [a]fter listening to the testimony of witnesses who previously testified that the defendant was Robert Mack, the tellers could have been influenced to testify with a firmer conviction of their recollection of the defendant's physical characteristics and of his identity as the perpetrator of the crime, and could have been less likely to admit doubt about their identification than they would have admitted if they had been sequestered. Thus, although the teller-witnesses' testimony related to different transactions, their identification of the defendant may have been influenced by the testimony of witnesses who had testified before them and this possible influence could have been avoided by sequestration.

*Lavelle*, 419 A.2d at 1274.

We contrasted that situation from the one in *Stephens*, where the victim was the second witness called, and the material parts of her testimony were based on her own

11

knowledge and could not have been influenced by previous testimony. Therefore, we found no error. *Id.*

Here, Dominguez argues that he was prejudiced by D.M.'s presence during J.D.'s testimony relating to count two of the amended information, regarding the rape of J.D. He contends that after Morris testified, J.D.'s testimony was "riddled with so many inconsistencies and impossibilities that no reasonable factfinder could conclude" that he was guilty of rape. Dominguez cites the following inconsistencies: (1) "Where did Dominguez penetrate [J.D.] and why did [J.D's] butt feel wet if she said that he penetrated her vagina?" (2) How is it that Ms. Morris didn't know what [J.D.] told [D.M.] when she came into the room 'crying and screaming' that Mr. Dominguez had touched her?" (3) "How could Ms. Morris not have heard [D.M.] accusing Mr. Dominguez of touching his daughters when [J.D.], who was in the same room with Ms. Morris, testified that she heard what [D.M.] was screaming when she went into his room?" and (4) "Did they tell Morris that [J.D.] stepped on a spider or that [J.D.] was bitten by a spider?"

Although Dominguez argues that D.M. was able to "tie up" certain "loose ends" in J.D.'s testimony, we see no prejudice. The "loose ends" Dominguez cites are at most minor discrepancies in testimony offered by J.D. and D.M. regarding the night J.D. told D.M. what had happened immediately after the third incident involving J.D. Regardless of any inconsistencies, Dominguez was able to cross-examine each witness about her testimony. The alleged "loose ends" and discrepancies Dominguez identified did not relate to the

12

material parts of J.D.'s testimony. Therefore, Dominguez has not shown that he was prejudiced by D.M.'s presence during J.D.'s testimony.

Dominguez also contends that he was prejudiced when D.M. was allowed to remain in the courtroom during Morris's testimony on count one of the amended information. That count related to the rape of D.M. Dominguez argues that D.M. was able to "clean up inconsistencies" that Morris and others "left behind for the jury." Specifically, Dominguez notes that D.M., "without specific prompting," testified that she did not remember "the part about the day and night thing" regarding the statement that Morris alleged Dominguez had made to D.M. and that she had overheard in the car. Dominguez also complains that D.M. testified that Morris was told about the sexual abuse three or four days after she initially told her boyfriend, but Morris led the jury to believe that she did not know of the abuse until the phone call. Finally, Dominguez notes that D.M. testified that he never hit her hard enough to leave a mark. Again, Dominguez was allowed to cross-examine the witnesses and the material parts of D.M.'s testimony were based on her own knowledge. Dominguez has not shown prejudice from D.M.'s presence during Morris's testimony.

In summary, unlike the situation in *Claiborne* or *Lavelle* where the identity of the perpetrator was in question, Dominguez was known to each of the victims. Additionally, the material parts of the testimony offered by J.D. and D.M. were based on their own personal knowledge. Any clarification of alleged inconsistencies was not central to the testimony leading to Dominguez's convictions. J.D. was not in the courtroom until she

13

testified and material parts of D.M.'s testimony could not have been influenced by prior testimony. Therefore, although it would have been prudent to at least require D.M. to testify first, we cannot say that the circuit court erred when it allowed D.M. to remain in the courtroom throughout the trial.

Because Dominguez received multiple life sentences, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Dominguez in compliance with Arkansas Supreme Court Rule 4-3(i), and no prejudicial error has been found.

Affirmed.

HART, J., dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** The accusations against Dominguez are condemnable in civilized society, but the accused is not guilty until his guilt is proven beyond a reasonable doubt through a fair and impartial trial. In Dominguez's case, this has not yet occurred because at his trial, Arkansas Rule of Evidence 615 was violated. When the Rule is invoked, fact witnesses must be sequestered. D.M. was obviously one of the victims in this case (*see* Ark. R. Evid. 616), but she testified as a fact witness regarding the count with J.D. as the victim—after having been permitted to remain in the courtroom during J.D.'s testimony over Dominguez's objection. This violates Rule 615.

The *Mitchell* case cited by the majority is inapposite. There, all the charges were related to a barroom escalation that occurred in one place on one night with one testifying

14

victim at trial. *Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996). Here, we have three different-in-time offenses against three different testifying victims.

A victim's right to be present in the courtroom cannot supersede the necessity of sequestration when the victim will later testify as a fact witness concerning other charges being presently discussed, lest we undermine the basic truth-seeking function of a jury trial. This weighs against requiring a robust showing of prejudice in the rare scenario where Rule 615 is violated—it's *hard to know* which part of a fact witness's testimony might be influenced by what she heard from earlier witnesses. The majority affirms this case, citing a lack of any apparent prejudice based on the testimony at trial, but prejudice may also be shown where, as here, the defendant receives the maximum possible sentence. *Kitchell v. State*, 2020 Ark. 102, at 10, 594 S.W.3d 848, 854 (citing *Buckley v. State*, 341 Ark. 864, 20 S.W.3d 331 (2000)). In short, Rule 615 has teeth only if trial judges know this court will enforce it. For that reason, I dissent.

*Tellez Law Firm PLLC*, by: *Cory L. Bates*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.