SLIP OPINION

Cite as 2016 Ark. 434

# SUPREME COURT OF ARKANSAS

No. CR-16-7

| | |
|---|---|
| TIMOTHY LAMONT HOWARD<br>APPELLANT | **Opinion Delivered:** December 8, 2016 |
| V. | APPEAL FROM THE LITTLE RIVER COUNTY CIRCUIT COURT<br>[CR1997-105] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE CHARLES A. YEARGAN, JUDGE |
| | AFFIRMED. |

**COURTNEY HUDSON GOODSON, Associate Justice**

A jury in the Little River County Circuit Court found appellant Timothy Lamont Howard guilty of two counts of second-degree murder and one count of attempted second-degree murder for which he received consecutive sentences totaling thirty-eight years in prison. For reversal, he contends that the circuit court erred by failing to grant his motions for directed verdict. We affirm.

This case involves the homicides of Brian Day and his wife, Shannon, and the attempted murder of their seven-month-old son, Trevor, which occurred in December 1997. The prosecuting attorney initially charged Howard with capital murder for the deaths of Brian and Shannon and with the attempted capital murder of Trevor. A jury found Howard guilty as charged, and he received two death sentences for the capital murders and a thirty-year sentence and a $15,000 fine for the offense of attempted capital-murder. This court affirmed his convictions and sentences. *Howard v. State*, 348 Ark. 471, 79 S.W.3d 273

(2002).[1] We also upheld the denial of postconviction relief. *Howard v. State*, 367 Ark. 18, 238 S.W.3d 241 (2006). In 2012, this court granted Howard permission to pursue a petition for writ of error coram nobis in the circuit court. *Howard v. State*, 2012 Ark. 177, 403 S.W.3d 38. The circuit court subsequently found merit in Howard's petition and ordered a new trial. The following facts are adduced from the record of this trial.

On Saturday, December 13, 1997, Danny Russell, the Sheriff of Little River County, received a dispatch at 10:00 a.m. about a U-Haul truck that was parked in a field and backed up to a wooded area. This field was located off a county road and on a farm owned by the Howard family near Ogden, Arkansas, approximately three miles from the intersection of Highway 71 and East Ogden Road. The report, which was made by persons searching for their escaped horses, was that blood was dripping out of the back of the U-Haul. After he arrived, Russell saw what appeared to be blood on the left side of the bumper, and he used bolt cutters to remove the padlock on the U-Haul's cargo area. Inside, he discovered the body of a deceased male.

Although the lease agreement found inside the U-Haul stated that the vehicle had been rented by Brian, the identity of the body was not immediately known. Once the authorities confirmed that it was Brian's body, they went to the Days' home near Ashdown to notify Shannon of his death. The officers received no answer at the door, but they later returned and gained entry into the home with the aid of Brian's brother, David Day. After hearing muffled cries coming from a bedroom, they found Trevor alive stuffed inside a closed Marlboro bag underneath clothing. He had a lamp cord wrapped tightly around his

---

[1] It was a 4–3 decision.

neck. The officers also found Shannon's body, who was naked below the waist, in the bedroom on the floor of a closet with clothing and other items stacked on top of her.

According to the medical examiner, Brian had sustained a hinge-type injury to the skull, caused by a massive delivery of force and which accounted for the high volume of blood found in the U-Haul. He also had been shot in the back of the head. The medical examiner offered the opinion that the hinge fracture occurred while Brian lay on the ground after being incapacitated by the gunshot wound. He stated that the hinge fracture was consistent with Brian's having been run over by the U-Haul while his head was wrapped in a piece of carpet found at the scene. The physical evidence at the site indicated that the assault on Brian had begun at an old cook shed in the field. The medical examiner estimated that Brian's death occurred between the hours of midnight and 8:00 a.m. Expert testimony also established that the projectile recovered from Brian's head was a .38-caliber bullet that had most likely been fired from a .38 Special or a .357 revolver. Vickie Howard, who was then Howard's ex-wife,[2] testified that Howard was in possession of a .38-caliber revolver on Friday, December 12, 1997, the day before Brian's body was found. Howard's fingerprints were on the outside of the driver's door of the U-Haul.

That Saturday morning, Herbert Jones was walking home from his aunt's house. At 8:30 a.m., he found a pair of work boots sitting sixty feet off the roadway at the corner of Highways 71 and 380, a distance of three miles from the Howard field. Blood on the left boot matched Brian's DNA. In her testimony, Vickie stated that the boots were the same

---

[2] Vickie and Howard remarried in October 2010, while he was in prison.

size and style of boots she had purchased for Howard. Hairs found inside the boots were a match to Howard's DNA.

The medical examiner also testified that Shannon died as a result of strangulation and blunt-force trauma. When her body was discovered, she had a ligature tied around her neck and her wrists were bound in handcuffs behind her back. The handcuffs had black fur on them. Jennifer Stanley, one of Howard's girlfriends, testified that the handcuffs were similar to those Howard had purchased at an adult novelty store.[3] At the Days' house, officers collected a Mountain Dew bottle with Howard's fingerprint on it.

By all accounts, Howard and Brian were long-time, close friends. One witness stated that "when I saw one, I saw the other. If one was into something, the other was into something." The testimony established that they used and sold drugs together. According to Vickie, Brian and Howard's friendship had cooled until two weeks before the murders. Lloyd Day testified that Brian suspected that Howard had stolen a rifle from him that Brian had borrowed from his brother and that Howard owed Brian a lot of money.[4] There was also testimony suggesting that Howard and Shannon were having an affair or that Brian suspected they were. Witnesses also testified that Shannon believed she was pregnant with Howard's child. Nonetheless, Howard accompanied Brian to rent the U-Haul on Thursday, December 11, 1997. The testimony of several witnesses indicates that the two had deals arranged for Thursday and Friday that either involved drugs or stolen merchandise.

---

[3] At the time of the murders and the first trial, Jennifer's last name was Qualls.

[4] Art Lamon testified that he purchased this rifle from Howard for $200 in October 1997.

On Friday, Shannon confided in David that she and Brian were afraid of Howard because "he found out something."

Howard's whereabouts that weekend were established primarily through the testimony of Vickie and Jennifer. Before her shift ended on Friday morning, December 12, 1997, Vickie left work and drove to Ashdown because she was worried about Brian and Shannon. At around 4:00 a.m., she stopped at a café to eat breakfast while waiting for them to wake up. Howard also arrived at the restaurant. Howard told her that he had just left the Days' house, and he discouraged her from visiting them because, he said, they were fighting. Instead, Vickie and Howard made plans to meet at the Motel 6 in Texarkana. Howard was driving a U-Haul truck, and at the motel, Howard told her not to tell anyone about the U-Haul because it would get her killed. Howard asked her to drive him to the family farm, and they arrived there before daylight. He told her to shine the headlights of her vehicle on the cook shed. Howard informed her that this was where Brian and Shannon were hiding their drugs, and Vickie testified that Howard went inside the shed and that she saw him bend down. Vickie then dropped off Howard at the apartment of Jennifer's sister, Kimberly Jones, whom Howard was living with at the time.[5] When Vickie returned to the motel, the U-Haul was still there.

At approximately 5:00 p.m. on Friday, Vickie picked up Howard at a friend's residence near Kimberly's apartment. They returned to the motel. Vickie stated that Howard was carrying a black nylon camera bag. She asked him what was inside the bag,

---

[5] Kimberly married Howard following his arrest and before the first trial. She died sometime after the first trial, and her testimony from that trial was presented by the defense.

and Howard replied that the bag contained "kinky stuff." He did not allow her to look inside the bag, and he said that its contents included handcuffs, rope, and tape. Vickie testified that Howard went to Walmart and that when he returned, she saw a .38 revolver sticking out of his pants. She stated that he left the motel driving the U-Haul at 9:30 p.m., wearing a black sweatshirt, jeans, and his work boots.

At approximately 11:00 p.m. that night, Howard called Jennifer and asked her to pick him up at a rest area on Highway 71 near the Red River Bridge. When she arrived, Howard emerged from her sister Kimberly's car and got into her vehicle. He told Jennifer he needed to rest. She testified that Howard was lying in her backseat and that his "body was just jerking and shaking and his eyes were all bugged out." Jennifer believed that he had been awake too many days doing drugs and that she had never seen him in that condition. They went to bed when they arrived at her duplex, and she said that Howard continued to shake as he lay beside her. He woke up sometime between 1:00 and 1:30 a.m. and told Jennifer that he had to go "take care of some business" and to get his money. She saw him put on his clothes and his work boots. Howard left in her silver 1997 Honda Civic, and he returned between 3:00 and 3:30 a.m. He awoke Jennifer to tell her that Shannon and Trevor would be staying with her while he and Brian "took care of some business." Jennifer saw Shannon, while she only heard Brian and Trevor. Jennifer went back to sleep, and she was alone when she awoke. Dale Fields testified that he was driving by the Days' home at 5:45 a.m. that morning and saw a small silver car sitting in the driveway.

Jennifer got up sometime between 6:30 a.m. and 7:00 a.m. that Saturday morning, and she proceeded to get ready for work. Howard came into the bathroom while she was

bathing and told her that Brian and Shannon were "in hiding" and that he was the only person who knew where they were. Jennifer noticed that her purse and wallet had been disturbed, and she asked Howard about her money. She testified that Howard removed two $100 bills from his pocket and laid them on the counter, saying that the money "should cover it." Jennifer further testified that Howard said he needed a truck and that he wanted her to ask her boss, Robin Jones, if he could borrow Jones's truck, a black Ford Splash. Howard told her that he needed to move furniture for Brian. After this conversation, Jennifer agreed to drive Howard back to the rest area. When she got into her car, she saw in the backseat Howard's black bag, some luggage, a jacket, and a purse. Upon inquiry, Howard stated that the luggage, the jacket, and the purse belonged to Shannon. When they arrived at the rest area, Howard left the black bag in Jennifer's vehicle, but he placed the other items in Kimberly's car, which was still at the rest area. Witnesses who were friends of Shannon's testified that she did not go anywhere without her purse.

Jennifer returned home to finish preparing for work. Howard came in fifteen minutes later. Jennifer stated that during this time frame, Howard had stopped by Kimberly's apartment and had given her $700. Jennifer said that Howard was angry at her because she would not call her boss about borrowing the truck. She testified that he said, "I need a God damn truck, and I gotta go." Shortly after Jennifer arrived at work, Howard appeared there and asked whether she had contacted Jones about the truck. Jennifer arranged for Howard to borrow the truck, and Howard picked it up from Jones between 9:30 and 10:00 a.m.

Howard went to Pro-Truck Outfitters in Texarkana between 9:00 and 10:00 a.m. There, he paid $140 in cash for the largest tool box the store had in stock. Testimony established that the tool box was large enough to hold an adult human body. Howard told the salesman, Eddie Scroggin, that he was driving a car and would have to return later in a truck to retrieve the tool box. Scroggin testified that Howard turned his back to Scroggin as he retrieved the cash to make the purchase. Scroggin said that Howard returned about an hour and a half later to pick up the tool box.

Also in her testimony, Vickie stated that Howard had called her at 11:00 a.m. on Saturday and asked her to pick him up at Miller Bowie in Texarkana. She said that Howard was driving a black truck she had never seen before. Vickie testified that Howard was nervous and afraid that the police would see him in the truck, and she said that he wanted to leave the truck and get rid of the keys. Howard explained to her that he was on his way to the farm to meet Brian when he saw the police and an ambulance heading in that direction and that he turned around because he thought something had gone wrong. Howard told her that his part of the deal was $4,000. She also said that Howard was worried because his fingerprints would be on a .38 he had given to Brian. Vickie testified that Howard was wearing the same clothes she had last seen him in except that he had on tennis shoes. She also said that when he got into her car, he pulled his coat up around his neck. Howard asked her to take him to the Motel 6, and he gave her $120 for a $30 room, telling her she could use the excess money to buy a Christmas present for her son.

Vickie contacted Jones and facilitated the return of the truck to him. Next, she took Howard to Kimberly's apartment. Howard called Jennifer that afternoon and told her that

a body had been found in a U-Haul near Ogden and that the dead person might be his best friend. He told Jennifer to clean out her car because it had been in the area of the U-Haul. Howard also asked her if she was going to "turn him in." When Jennifer arrived home from work, the tool box Howard had purchased was sitting in her front yard. The box was filled with cleaning supplies, which she discovered had been taken from her home. She also recalled that Howard had asked her to leave a key underneath her doormat.

Meanwhile, Howard and Kimberly checked into a motel room upon learning that a body had been found in the U-Haul. According to Kimberly, Vickie called her and Howard at approximately 4:00 p.m. and told them that Brian and Shannon were dead. Howard and Kimberly appeared at Jennifer's duplex at 5:00 p.m. They informed Jennifer of Brian's and Shannon's deaths. Jennifer said that she walked with Howard while he retrieved his black bag from her car. She asked him where he was going, and she said that Howard replied, "I don't know" and that he said, "I'm getting out of here because I'm gonna be accused of killing Brian and Shannon." The three left together in Jennifer's Honda, and Jennifer stated that Howard returned the black bag to her car. Jennifer said that Howard was quiet and did not appear to be upset about the deaths of his best friend and his wife.

Jennifer further testified that she, Howard, and Kimberly drove to Shreveport. On the way, Howard called Vickie, and she informed him that the police wanted to talk to him, but he told her that he did not want to speak to them right then. Jennifer said she asked Howard what had become of Shannon's belongings that had been in her car earlier that day. He told her he had "gotten rid of" her things. Jennifer also overheard Howard asking Kimberly what she had done with the key to the padlock of the U-Haul, and Kimberly told

him she had thrown it away. In further conversations, Howard told Jennifer he had purchased the tool box for Brian. Jennifer was not aware that Brian owned a truck. Howard also told her that he and Brian were going to use the supplies she found in the box to clean something. In addition, Howard advised Jennifer that he had been at the Days' house early that Saturday morning in her vehicle. He said that he had been waiting for Brian to come home and that Shannon wrote Christmas cards while he drank a Mountain Dew.

The trio went to a Walmart in Shreveport, and Howard gave them $50 to buy toiletries because they had not had time to pack before they left. They did not stay the night in Shreveport because there were no hotel rooms available. The three then drove to New Boston, Texas, and rented a motel room there. Sunday, that next morning, Kimberly and Jennifer purchased a newspaper, and they read about the bloody boots being found. Howard commented that his boots had been in the U-Haul and that someone was "setting him up."

Sunday afternoon, Howard, Kimberly, and Jennifer went to the sheriff's office to give statements. Howard instructed the sisters "not to say anything about the money." After Jennifer had given her statement, Howard asked her if she had mentioned the tool box, and she told him she had not. Jennifer stated that she and Howard returned to her duplex after giving their statements. She said that she made a comment about calling the police and that Howard slung her across the room. On Wednesday, Jennifer decided to meet again with the officer who was investigating the murders. She met him at a lake because she was too frightened to be seen at the sheriff's office. Jennifer gave the officers

permission to search her car, and they found Howard's black nylon bag. It contained rope and a roll of tape, but no handcuffs.

Based on the evidence, the jury adjudged Howard guilty of second-degree murder in connection with the deaths of Brian and Shannon and of attempted second-degree murder with regard to Trevor. As mentioned, he received a combined term of thirty-eight years' imprisonment for these convictions. This appeal followed.

As his sole issue on appeal, Howard contends that the circuit court erred by denying his motions for directed verdict because the evidence does not demonstrate that he was the perpetrator of the offenses. He argues that the State's theories of the murders are not supported by the evidence. Howard points to testimony demonstrating that Shannon was not pregnant at the time of her death. He also maintains that there was no evidence as to how much money Howard owed Brian and that there was testimony that Brian owed other people money. Howard asserts that Brian did not name Howard as a suspect when he reported to the police that the rifle had been stolen, and he suggests that Brian knew what had happened to the gun and reported it as stolen when his brother pressed for its return. He also takes issue with the notion that Brian engaged in a drug deal on Thursday because witnesses stated that Brian had no drugs for sale on Friday. He also contests the State's theory of how the blood got on the boots and how they came to be placed where they were found. Howard also disputes whether Brian was dragged across the field on a piece of carpet, and he posits that the hinge fracture Brian sustained might have been caused by his being stomped on with a boot. He notes that the boots that were found had no blood on the bottom of them and that unidentified Caucasian hairs were inside the boots. Howard also

SLIP OPINION

points to evidence that unidentified fingerprints were discovered on the picture frames found on top of Shannon's body. In addition, he notes that no fibers, blood, or DNA of his were on anything tested from Brian and Shannon. Howard asserts that none of his clothes had blood on them and that he had no scratches or injuries on his hands or face. He is also critical of the investigation conducted by the police. Finally, he relies on evidence suggesting that others had a motive to kill Brian and Shannon.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Brooks v. State*, 2016 Ark. 305, 498 S.W.3d 292. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence. *Wells v. State*, 2013 Ark. 389, 430 S.W.3d 65. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Sylvester v. State*, 2016 Ark. 136, 489 S.W.3d 146. In reviewing a sufficiency challenge, we view the evidence in the light most favorable to the State, considering only evidence that supports the verdict. *Mercouri v. State*, 2016 Ark. 37, 480 S.W.3d 864.

Evidence of guilt is not less because it is circumstantial. *Chatmon v. State*, 2015 Ark. 28, 467 S.W.3d 731. Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Airsman v. State*, 2014 Ark. 500, 451 S.W.3d 565. Whether circumstantial evidence excludes every other reasonable hypothesis consistent with innocence is for the jury to decide. *Dixon v. State*, 2011 Ark. 450, 385 S.W.3d 164. Finally, the credibility of the witnesses is an issue for the jury and not the court. *Green v. State*, 2013

Ark. 497, 430 S.W.3d 729. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686.

Also, efforts to conceal a crime and evade detection can be considered as evidence of consciousness of guilt. *Barrett v. State*, 354 Ark. 187, 119 S.W.3d 483 (2003). False, improbable, and contradictory statements to explain suspicious circumstances may be considered by the jury in determining guilt. *Hill v. State*, 299 Ark. 327, 773 S.W.2d 424 (1989).

Howard's arguments challenging the sufficiency of the evidence overlook the fact that our standard of review requires us to consider the evidence in the light most favorable to the State and to only consider evidence that supports the verdicts. *Mercouri*, *supra*. When the evidence is viewed in that fashion, there is substantial evidence to support the jury's findings of guilt. Brian was found in a remote field on property owned by the Howard family. His body was locked inside a U-Haul truck rented by Brian but driven by Howard before the murder. Howard's fingerprints were on this truck. According to the testimony, his girlfriend Kimberly disposed of the key to the lock on the U-Haul. Boots like those worn by Howard were found a short distance from the field. Brian's blood was found on one boot, and Howard's hair was found inside the boots. Although Howard was wearing boots in the hours before Brian's body was discovered, he was wearing tennis shoes afterward. In addition, Howard essentially admitted that the boots were his when he proclaimed to Kimberly and Jennifer that he was being set up when they read about the boots in the newspaper. Howard purchased a large tool box that morning, and the

testimony indicated that he was on his way to the field in a truck that he insisted on borrowing with a tool box filled with cleaning supplies. Upon seeing the police, Howard avoided detection and returned to Texarkana. Although Howard said he believed that something had gone wrong with Brian, he left rather than check on his friend. Howard was also afraid that the police had seen him in the truck, and he distanced himself from that vehicle. Howard had also been in possession of a .38–caliber revolver the day before Brian was shot with a weapon of that kind.

The testimony also reveals that Howard was with Brian, Shannon, and Trevor in the wee hours of that Saturday morning. At that time, he was traveling in Jennifer's vehicle, which contained Shannon's purse, jacket, and luggage. Howard later told Jennifer he had disposed of Shannon's belongings. He also advised Jennifer to clean out her car because it had been located near the U-Haul. A vehicle of this description was also seen at the Days' home that morning. Shannon's hands were bound with handcuffs identical to those that Howard was known to possess. Although he had told Vickie that his black bag contained handcuffs, no handcuffs were found inside the bag when it was recovered from Jennifer's car and searched.

Howard's actions and other statements also support the jury's verdict. When he left Jennifer's house at 1:30 a.m. on Saturday, he told her that he was going to get his money. Despite not having a job, he spent and dispensed a fair amount of cash that day. Howard instructed Kimberly and Jennifer not to mention the money when they gave their statements to the police. It is also telling that Howard left town Saturday night and did not wish to speak to the police. In addition, he made inconsistent statements to Jennifer. At first, he

told her that the Days were in hiding, but he later said that he had been at the Days' home drinking a Mountain Dew with Shannon while she wrote Christmas cards. A Mountain Dew bottle with Howard's fingerprint on it was found in the Days' living room. Howard also told Jennifer that he needed Jones's truck to help Brian move furniture, although the U-Haul had been rented.

Citing *Roderick v. State*, 288 Ark. 360, 705 S.W.2d 433 (1986), Howard maintains that evidence demonstrating that he was last seen with the victims is not sufficient to support a conviction. However, the evidence in this case demonstrates much more than that. It is our conclusion that the jury's verdicts are supported by substantial evidence. Therefore, we affirm his convictions and sentences.

Affirmed.

*Janice W. Vaughn*, Arkansas Public Defender Commission, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee