Cite as 2024 Ark. App. 528

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CR-24-36

| | | |
|---|---|---|
| TYLER EDWARD TAIT | | Opinion Delivered October 30, 2024 |
| | APPELLANT | APPEAL FROM THE CHICOT COUNTY CIRCUIT COURT [NO. 09CR-21-90] |
| V. | | |
| | | HONORABLE CREWS PURYEAR, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## WENDY SCHOLTENS WOOD, Judge

Tyler Tait appeals the Chicot County Circuit Court sentencing order convicting him of second-degree murder and sentencing him to thirty years' imprisonment and a $15,000 fine. In addition to challenging the sufficiency of the evidence supporting his conviction, Tait argues that the circuit court erred in instructing the jury on the lesser-included offense of second-degree murder and in denying his motion for a new trial based on juror misconduct.[1] We affirm.

### I. *Facts*

---

[1]On January 23, 2024, Tait's counsel filed a motion seeking the recusal or disqualification of Judge Stephanie Potter Barrett. The motion was passed to the panel for consideration with the submission of the case. Because Judge Barrett is not on this panel, the motion is denied as moot.

Tait is a physician in Oklahoma. Moria Kinsey was a traveling nurse working in Hot Springs. She was married but having an affair with Tait. On October 11, 2021, Tait and Kinsey were returning from Alabama after the funeral of Tait's brother. They stopped in Lake Village before continuing north on Highway 65 at 1:07 p.m. At 1:12 p.m. and several miles north of Lake Village, Tait called 911 and reported that Kinsey was having a seizure and was not breathing. He pulled over in the median and began CPR. When others stopped to help, he let them take over resuscitation efforts. He walked away from Kinsey and across the highway. Kinsey died, and Tait was charged with first-degree murder.

At trial, witnesses testified about what they saw that day. Jimmy Hicks, a retired nurse, pulled over after seeing a man performing CPR on Kinsey in the median. Hicks called 911 and went to assist. Hicks saw blood coming from Kinsey's mouth and nose. Hicks testified that while the man was performing CPR, Tait acted "irrational, I'd say. Bizarre actions. Going around just sounded like he was talking to himself . . . I've been around people that are, I'll say concerned about a person. They want to do something to help. This person didn't do anything to try to help."

Alex Dillard, an officer with the Arkansas Game and Fish Commission, also stopped when he saw a man doing chest compressions in the median. Dillard's body camera recorded Tait, and the video was introduced at trial. The video showed Tait walking in the median and then on the other side of the road. The first statement Tait made on the video was: "Don't do this. Don't do this. Please. I didn't fucking do nothing." He later said, "I didn't

fucking do this. Fuck this shit. . . . Fuck this. This ain't on me. Nuh uh. I didn't fucking touch her."

Deputy Paul Hale with the Chicot County Sheriff's Office testified that he was dispatched at 1:12 p.m. and arrived at the scene at 1:25 p.m. Deputy Hale stated that when he approached, there was a woman lying in the ditch while two men—one trying to do CPR and the other tilting her head back—were rendering aid. Deputy Hale said that Tait was walking in the median about twenty-five yards away and was yelling, "Is she dead? Is she dying?" Deputy Hale said that Tait crossed the road and continued yelling. At one point, he saw Tait put his shirt over his head.

Dr. Theodore Brown, chief medical examiner at the Arkansas State Crime Laboratory, performed the autopsy on Kinsey. Dr. Brown determined Kinsey's cause of death was strangulation, and the manner of death was homicide. He supported his conclusions with evidence that he found vascular congestion throughout her cheeks, forehead, nose, and around her eyes. He explained that this occurs when blood is forcefully pushed out into the tissues and presents as a red, congested, vascular look to the skin. Dr. Brown said that there was some vascular congestion in the front portion of Kinsey's neck but also an area of "pallor" or "white area" that had no congestion. Dr. Brown said that this alone was not indicative of strangulation, but it played a role in his ultimate opinion as to the cause of death. Dr. Brown testified that this pallor along with the internal examination of the neck tissue led to the determination. Dr. Brown testified that Kinsey's neck had a "significant amount of blood that extended superficially of the muscles of the neck and down deep all

layers of her neck musculature." Stated another way, Dr. Brown said that Kinsey "had diffuse extensive hemorrhage, or bleeding, in all layers of her neck muscles, to include the superficial neck muscles all the way down deep into the deep muscles of the neck in front of her airway." He explained that this amount of profuse bleeding indicated that there was "significant trauma" to Kinsey's neck, which could be the result of blunt-force trauma to her neck or of pressure to or compression of her neck, including strangulation. Dr. Brown said that the "answer of why she's dead is in her neck."[2]

Dr. Brown also testified that Kinsey had a fractured thyroid cartilage in her neck, which was also evidence of trauma to her neck. Dr. Brown opined that the injuries Kinsey sustained during medical treatment, which included fractured ribs and a fractured sternum, did not contribute to her death. He stated that these are common injuries resulting from CPR. Dr. Brown stated that there was an endotracheal tube in place and that he did not see any obvious injuries to the airway from the placement of the tube. He also did not think that any of her neck injuries were caused by medical treatment or from natural causes. Dr. Brown testified that in a majority of strangulation cases, there are external traumatic findings, and he noted that Kinsey did not have petechial hemorrhaging in her eyes. But he also explained that there are strangulation cases without external findings, which is why a full autopsy is done with an internal examination of the neck. Dr. Brown said that it takes about ten to twenty seconds for a person to become unconscious with a significant amount of pressure to

---

[2]The State introduced into evidence multiple autopsy photographs, including external and internal pictures of Kinsey's neck.

4

the neck, and if the pressure is applied continuously for two to three minutes, death is a likely outcome. Finally, he testified that there were no illicit drugs detected in Kinsey's body and only a trace amount of alcohol.

On cross-examination, Dr. Brown agreed that the broken thyroid cartilage could have been due to a failed intubation. He also testified that Kinsey's liver was slightly enlarged and had fatty liver change, which can be caused by chronic alcohol use. Dr. Brown explained that he did not look at Kinsey's brain under a microscope because he did not think it was necessary, despite the report that Kinsey had a seizure. He said that he did not need additional studies of the brain beyond his gross examination to come to a conclusion as to the manner of death. Dr. Brown acknowledged that he was not made aware that someone had reported a concern about Kinsey's extreme drinking the week before her death and that if someone went off alcohol "cold turkey," withdrawal symptoms can cause a seizure that could cause death.

Bryan Albritton, a special agent with the Criminal Investigation Division of the Arkansas State Police, was assigned to investigate Kinsey's death. After Tait waived his *Miranda* rights, Albritton conducted a recorded interview with Tait, which was introduced into evidence and played for the jury. Tait told Albritton that he and Kinsey were "riding down the road, everything is normal, it's fine, and then [Kinsey], my girl ~ she's just – like contorting and shit." Tait said he called 911 on his phone asking for help. He did not know where he was, so he pulled over to the median. He said he dropped his phone, and the 911 dispatcher told him to calm down. He said he then told the dispatcher that his girlfriend was

5

having a "seizure or something." Tait spoke about how Kinsey had been drinking heavily the night before. Tait also pondered whether Kinsey's death could have been caused by other things such as an allergic reaction to chicken skin, being licked by an armadillo, or demon possession.

After the State rested, the defense moved for a directed verdict, which was denied. The defense presented the testimony of Dr. Robert Bux, a forensic pathologist who disagreed with Dr. Brown and classified Kinsey's death as "undetermined." Dr. Bux pointed to Kinsey's tachycardia recorded on her Apple watch in the days before her death, her alcoholism, and her bruising. Dr. Bux opined that the profuse bleeding in Kinsey's neck was the result of the fractured sternum that occurred during CPR that bled in that direction due to the position of her body. He also testified that her fractured thyroid cartilage could have been caused by the misplacement of the tracheal tube during the first unsuccessful intubation attempt.

Riley Bunch, Kinsey's roommate and coworker while she was a travel nurse in Hot Springs, testified that Kinsey had a severe alcohol problem and had showed up at work intoxicated. Bunch had texted Tait on October 3, 2021, about a week before Kinsey's death, to express his concerns about her drinking. Bunch wanted Tait to get Kinsey help and worried about her going into withdrawals.

Tait testified in his own defense and denied killing Kinsey. He said that Kinsey had a seizure when they were several miles north of Lake Village. The State introduced text messages between Tait and Kinsey from October 3, 2021, that revealed the couple had a troubled relationship. In these messages, Tait appears to be accusing Kinsey of cheating on

6

him. Some of the messages could be interpreted as threatening, such as "I know where your house is too" and "Do you believe in the Muslim [adage], an eye for eye?"

The defense rested and renewed the directed-verdict motion, which was denied. The defense then objected to the case being submitted on lesser-included offenses because Tait's defense was that he was "not guilty at all." The circuit court overruled Tait's objection and found that there was a rational basis to submit the case on second-degree murder but not manslaughter. The jury acquitted Tait of first-degree murder but found him guilty of second-degree murder. A few days after trial, Tait moved for a new trial on the basis of juror misconduct, which was denied following a hearing. This appeal followed.

II. *Sufficiency of the Evidence*

On appeal, Tait contends that the circuit court erred in denying his motion for directed verdict.[3] He argues that the second-degree-murder conviction is not supported by substantial evidence because the conviction rests on speculation and conjecture as to the cause and manner of Kinsey's death.

---

[3]The State contends that Tait's sufficiency argument is not preserved because he failed to move for a directed verdict on any lesser-included offenses, including second-degree murder. In his motion, Tait argued that the State had failed to present any evidence "outside the realm of speculation" to support the charge of first-degree murder, which required proof that he purposely caused Kinsey's death. He further argued that there was "no evidence to support the causing of death either purposely or in any other way." We conclude that Tait's motion preserved his argument because he was challenging the sufficiency of the evidence as to whether he killed anyone, which includes the lesser-included offense of second-degree murder. *See Davis v. State*, 317 Ark. 592, 595, 879 S.W.2d 439, 441 (1994).

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Price v. State*, 2019 Ark. 323, at 4, 588 S.W.3d 1, 4. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.*, 588 S.W.3d at 4. We affirm a conviction if substantial evidence exists to support it. *Id.*, 588 S.W.3d at 4. Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.*, 588 S.W.3d at 4. Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Howard v. State*, 2016 Ark. 434, at 12, 506 S.W.3d 843, 850. Whether the evidence excludes every other hypothesis is for the jury to decide. *Id.*, 506 S.W.3d at 850. Once it is determined that the evidence is sufficient to go to the jury, the question whether the circumstantial evidence excludes any other hypothesis consistent with innocence is for the jury to decide. *Mulkey v. State*, 330 Ark. 113, 117, 952 S.W.2d 149, 151 (1997).

A person commits murder in the second degree if he knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life, or with the purpose of causing serious physical injury to another person, the person causes the death of any person. Ark. Code Ann. § 5-10-103 (Repl. 2013).

The primary issues in this case were the cause and manner of Kinsey's death. Tait focuses on the testimony of his expert, Dr. Bux, and contends that Dr. Bux "properly opined that the intellectually honest conclusion as to Kinsey's death must be 'undetermined.'" Tait

points to the conflicting evidence to indicate that the "phenomena" seen on Kinsey's body were preexisting injuries, the result of medical intervention, or consistent with natural causes. Tait further argues that Dr. Brown's opinion, upon which the State's case was based, was based on speculation and conjecture rather than "reasoned, unbiased conclusion based upon the actual evidence" and does not constitute substantial evidence sufficient to support his conviction.

Tait's argument challenges witness credibility. The jury may believe all or part of any witness's testimony and is responsible for resolving questions of conflicting testimony and inconsistent evidence. *Jenkins v. State*, 2020 Ark. App. 45, at 5, 593 S.W.3d 51, 54. Moreover, it is well settled that the credibility of witnesses is an issue for the jury and not our appellate courts. *Id.*, 593 S.W.3d at 54. The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Id.*, 593 S.W.3d at 54. This is true even of opinion testimony offered by experts. *Id.*, 593 S.W.3d at 54. *See also Kaufman v. State*, 2013 Ark. 126, at 6 (holding that in a case of competing expert-witness testimony, the jury is not bound to accept the expert-opinion testimony of any witness as true or conclusive and that the jury was entitled to believe the testimony of the State's expert over the defendant's experts).

Although Dr. Bux testified that the cause of Kinsey's death was undetermined, Dr. Brown testified that Kinsey's cause of death was strangulation and the manner of death was homicide. He described in detail the medical findings that supported his opinion that included vascular congestion and "diffuse extensive hemorrhage, or bleeding, in all layers of

9

her neck muscles, to include the superficial neck muscles all the way down deep into the deep muscles of the neck in front of her airway." He concluded that there was "significant trauma" to Kinsey's neck, which is indicative of blunt-force trauma to the neck or of pressure or compression of the neck as occurs in strangulation. Dr. Brown also testified that Kinsey had a fractured thyroid cartilage in her neck, which was also evidence of trauma to her neck. Dr. Brown said that the "answer of why she's dead is in her neck."

The jury heard competing opinions from Drs. Brown and Bux. The jury was entitled to believe the testimony of the State's expert over that of Tait's expert and to decide the causation question adversely to Tait. *Kaufman*, 2013 Ark. 126, at 6. Accordingly, we hold that there was substantial evidence for the jury to conclude that Tait committed the offense of second-degree murder.[4]

## II. *Jury Instructions*

Under this point, Tait first argues that the circuit court erred in instructing the jury—over his objection—on the lesser-included offense of second-degree murder. Tait contends on

---

[4]Tait's sufficiency argument is very narrow—that substantial evidence does not support his conviction because Dr. Brown's cause-of-death testimony rests on speculation and conjecture. As set forth above, we disagree. We also note that on the issue of causation, Tait denied having anything to do with Kinsey's death, yet there was substantial evidence presented to the jury (in addition to Dr. Brown's testimony) that called his credibility into question. For instance, Tait was the only person with Kinsey between 1:07 p.m. and 1:12 p.m. when Kinsey's injuries occurred; one witnesses described Tait's behavior at the scene as "bizarre," and video of Tait at the scene was played for the jury; text messages between Tait and Kinsey were introduced that showed a troubled relationship; and in his statement to the state police, Tait suggested that Kinsey's death was caused by an allergic reaction to chicken skin, being licked by an armadillo, and demon possession.

appeal as he did at trial that *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986), bars the court from instructing on a lesser-included offense when the defendant denies any culpability for the greater offense. Relying on *Doby*, Tait contends that, as a matter of law, if there is no rational basis for the defense to obtain a lesser-included-offense instruction, there is no rational basis for the State to obtain one.[5]

Our analysis begins with Arkansas Code Annotated section 5-1-110(c) (Repl. 2013), which provides: "The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him or her of the included offense." An instruction on a lesser-included offense is appropriate when it is supported by the slightest evidence. *Grillot v. State*, 353 Ark. 294, 318, 107 S.W.3d 136, 150 (2003).

Tait acknowledges that the State is allowed to ask for lesser-included-offense instructions. *See, e.g.*, *State v. Jones*, 321 Ark. 451, 903 S.W.2d 170 (1995). In *Jones*, Jones was charged with first-degree murder. Over the State's objection, the circuit court refused to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter, stating that if the defense wants "to gamble, I think it is their choice." *Id.* at 454, 903 S.W.2d at 172. Jones was acquitted of first-degree murder, and the State appealed. Our supreme court declared that the circuit court erred to the extent that its ruling was based on the

---

[5]On appeal, Tait makes a one-sentence constitutional equal-protection argument. To the extent it is preserved, Tait fails to develop the argument in his brief. Therefore, we will not consider it. *Newman v. State*, 2019 Ark. App. 38, at 5–6, 567 S.W.3d 110, 113.

rationale that the defense was allowed to "gamble." *Id.* at 455, 903 S.W.2d at 173. The

supreme court held that section 5-1-110(c) "does not delegate the decision regarding the

propriety of the proffered instruction to the defendant" but requires the circuit court (1) to

determine whether it is a lesser-included offense and (2) whether a rational basis exists for a

verdict acquitting the defendant of the greater offense and convicting him of a lesser. *Id.* at

455, 903 S.W.2d at 173. The court specifically noted that section 5-1-110(c) does not

"expressly confer a right to a lesser included offense instruction solely upon the defendant.

Further, this court has stated that, in appropriate cases, the instruction should be given over

the defendant's objection. *Lampkin v. State*, 271 Ark. 147, 607 S.W.2d 397 (1980)." *Id.* at

455 n.1, 903 S.W.2d at 173 n.1; *see also Chaney v. State*, 256 Ark. 198, 199, 506 S.W.2d 134,

135–36 (1974) (holding that because second-degree murder is a necessarily included lesser

offense of first-degree murder, it is within the circuit court's discretion to give the instruction

upon request of the prosecutor even over the defendant's objection); *Kurck v. State*, 235 Ark.

688, 362 S.W.2d 713 (1962) (holding it was not error to give an instruction for assault with

intent to rape over the defendant's objection in a rape prosecution because assault with

intent to rape is a necessarily included lesser offense). As explained by the supreme court in

*Jones*, section 5-1-110(c) requires the circuit court to consider the evidence presented and

make a rational-basis determination, even if the State is requesting the instruction and even

if a defendant objects and claims complete innocence.

The circuit court in the instant case complied with section 5-1-110(c). It considered

the evidence presented and concluded that there was a rational basis to instruct the jury on

second-degree murder because there was the slightest evidence that the jury could convict him on that charge.[6] The circuit court specifically relied on Dr. Brown's testimony about how long it would take to cause Kinsey's injuries—he said it would take about ten to twenty seconds for a person to become unconscious with a significant amount of pressure to the neck, and that if pressure is applied continuously for two to three minutes, death is a likely outcome. Dr. Brown determined the cause of death to be strangulation, and Tait was the only person with Kinsey during the time in which strangulation could have occurred. This constitutes, at the least, the "slightest evidence" that Tait knowingly caused Kinsey's death under circumstances manifesting extreme difference to the value of human life or purposely caused serious physical injury to Kinsey that caused her death. Therefore, we cannot say that the circuit court erred in giving the second-degree-murder instruction.

We reject Tait's argument that *Doby* created a rule that it is "improper to instruct the jury on a lesser-included offense if the defendant denies all culpability." Doby was charged with possession of a controlled substance with the intent to deliver. His defense was a complete denial that he possessed a controlled substance. Doby requested an instruction on the lesser-included offense of possession of a controlled substance. However, the circuit court denied the request because there was evidence that Doby admitted to law enforcement that he possessed controlled substances with the intent to sell them. Thus, there was no rational basis to give the lesser-included-offense instruction considering the evidence in that case. The

---

[6]The circuit court found that there was no rational basis in the evidence to submit the lesser-included-offense instruction of manslaughter.

13

supreme court affirmed the denial of Doby's requested lesser-included-offense instruction. *Doby*, 290 Ark. at 414, 720 S.W.2d at 697.

The facts in Tait's case are distinguishable from those in *Doby*. In *Doby*, there was no rational basis in the evidence to give the lesser-included-offense instruction. However, in the case at bar, there was a rational basis in the evidence to give the lesser-included-offense instruction of second-degree murder—the State presented evidence that Kinsey was strangled to death between 1:07 p.m. and 1:12 p.m. and that Tait was the only person with her at the time. Despite Tait's claim of innocence, this is not a *Doby* case, and the circuit court did not err in giving the second-degree-murder instruction.

For his second argument under this point on appeal, Tait argues that second-degree murder is not a lesser offense of first-degree murder because the language "under circumstances manifesting extreme indifference to the value of human life" adds an element not present in the greater offense. The supreme court, however, has held that second-degree murder under "circumstances manifesting extreme indifference to the value of human life" is a lesser-included offense of purposeful first-degree murder. *McCoy v. State*, 347 Ark. 913, 924, 69 S.W.3d 430, 437 (2002).

### III. *Jury Misconduct*

Tait contends that the circuit court erred in denying his motion for a new trial on the basis of juror misconduct. The decision whether to grant or deny a motion for new trial lies within the sound discretion of the circuit court, and this court will reverse only if there is a manifest abuse of discretion. *Taffner v. State*, 2018 Ark. 99, at 14, 541 S.W.3d 430, 438. A

circuit court's factual determinations on a motion for a new trial will not be reversed unless clearly erroneous, and the circuit court determines issues of credibility. *Id.*, 541 S.W.3d at 438. The party moving for a new trial bears the burden of proving, first, that juror misconduct occurred and, second, that there was a reasonable probability of resulting prejudice. *Id.*, 541 S.W.3d at 438. The court does not presume prejudice but rather presumes that jurors are unbiased and qualified to serve, and it is the appellant's burden to show otherwise. *Id.*, 541 S.W.3d at 438.

On June 26, 2023, three days after Tait's jury trial, he filed a motion for new trial pursuant to Arkansas Rule of Criminal Procedure 33.3(a)[7] and Arkansas Code Annotated section 16-89-130 (Repl. 2005), alleging juror misconduct. Tait attached the affidavit of juror ST, which provided in part:

> At the beginning of jury deliberations on June 23, juror [MJ] said while the room was getting seated "I guess y'all have all checked this guy out." Someone said "Not me, I haven't!" I then said "Don't say that again, we can't do that." It was clear to me she meant the Internet. I also believe [MJ] said "Well I have."

Tait asserted that the circuit court must conduct a hearing and "at the very least" inquire of ST and MJ about whether "extraneous prejudicial information was improperly brought to the jury's attention." Tait argued that if the information provided by ST was correct, the court must grant his motion for a new trial.

As requested, the circuit court summoned ST and MJ to appear for a hearing on July 13. ST testified that the jurors were in the process of getting seated at the outset of

---

[7]The motion incorrectly refers to Rule 33.1(a).

deliberations when MJ said, "I guess y'all have checked this guy out." ST stated that two or three jurors responded that they had not, and ST said "don't say that again . . . we are not supposed to do that." The court asked ST whether MJ mentioned the internet, and ST said that was the "implication." ST testified that MJ said, "Well I have." Upon further questioning by the State, ST also testified that MJ may have said that "th[ere's] some bad stuff on this guy," but he did not know for sure. He was only sure that MJ said, "Well I have." When questioned by the defense, ST said that he thought MJ had done the research during trial.

MJ testified that she did not remember making the alleged statement or any similar statement. She denied researching Tait before or during trial or reading any news articles related to Tait or the case. Upon questioning by the defense about whether MJ recalled "what [she] said, if anything," MJ responded that after deliberations she said that she would probably look him up because she thought there "might have been some prior things going on." MJ testified that she knew nothing about the case, other than what she had learned in the courtroom, before deliberations began.

At the conclusion of the testimony, defense counsel stated that due to the "diametrically opposed testimony," the hearing needed to be "recessed and reconvened" after the other ten jurors were summoned to testify about what they heard because the court was going to have to make a credibility determination. Alternatively, defense counsel argued that there was sufficient testimony for the court to grant the motion for new trial. The State responded that if the defense wanted to call the other jurors, defense counsel should have

16

issued subpoenas for those witnesses. The State further argued that it was no surprise that the two witnesses would have inconsistent testimony. Defense counsel responded that the court summoned the two witnesses on its own.

In its oral ruling, the circuit court stated that the defense requested that the court inquire of these two witnesses and "that's what I did." The court stated that it found "most troubling" that ST failed to mention in his affidavit that MJ said "there's some bad stuff on this guy." Specifically, the court stated, "I just don't find it believable that he wouldn't have included it in his affidavit. I'm judging credibility based on that." The court further found that MJ was "unequivocal" that she did not do research before or during trial and did not announce that to the jury room; as a result, the court found MJ credible. Considering these findings, the court concluded that Tait failed to meet the first prong—that juror misconduct had occurred. On July 13, the circuit court entered a written order denying the motion for new trial for the reasons stated in its oral ruling.

Here, the circuit court agreed that an inquiry was necessary, summoned the two jurors to a hearing, and questioned them about the allegations. The court made credibility determinations against ST and in favor of MJ. Considering the testimony and the circuit court's credibility determinations, we cannot say that the circuit court abused its discretion in denying Tait's motion for new trial.

Affirmed.

KLAPPENBACH and THYER, JJ., agree.

*Jeff Rosenzweig* and *Robert G. Bridewell*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Walker K. Hawkins*, Ass't Att'y Gen., for appellee.